CITY OF WARRENSBURG, MISSOURI, and Industrial Development Authority of the City of Warrensburg, Missouri, Plaintiffs,

v.

RCA CORPORATION, CIT Financial Corporation and All-Steel, Inc., Defendants.

No. 80–0993–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Aug. 19, 1983.

Thomas J. Conway, Thomas A. Sweeny, Michael J. Maloney, Popham, Conway, Sweeny, Fremont & Bundschu, P.C., Kansas City, Mo., for plaintiffs.

Karl F. Schmidt, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Joanne M. Gentile, New York City, for defendants.

## MEMORANDUM OPINION AND ORDERS GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN REGARD TO FIRST AMENDED COMPLAINT

JOHN W. OLIVER, Senior District Judge.

This case pends on defendants' motion for summary judgment, filed in regard to all eight counts of plaintiffs' First Amended Complaint filed by leave of Court on January 26, 1983. In the alternative, defendants seek partial summary judgment with regard to various items of alleged damages.

For reasons we shall state in detail, defendants' motion will be granted and the Clerk will be directed to enter final judgment in favor of defendants with regard to all eight counts of the First Amended Complaint.

## I. *Procedural History*

On November 10, 1982 we granted in part defendants' summary judgment motion in regard to the original petition removed to this Court from the Circuit Court of Jackson County, Missouri. *See* Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment in Regard to Count I and Orders Directing Further Proceedings reported at 550 F.Supp. 1364. In that Memorandum Opinion, we fully stated our reasons for concluding that summary judgment should be granted in favor of defendants with respect to Count I of the original petition (alleging breach of contract against defendant All-Steel).

We also directed further proceedings consistent with *SuperTurf, Inc. v. Monsanto Co.,* 660 F.2d 1275 (8th Cir.1981) in regard to Counts II and III of the original petition (alleging tortious interference against defendants CIT and RCA and negligent misrepresentation against defendants All-Steel and CIT) and in regard to each of the eight counts of plaintiffs' proposed first amended complaint.

Pursuant to Order (5) of that November 10, 1982 Memorandum Opinion and Orders, counsel contacted the Court to convene a pretrial conference on November 30, 1982. At that conference, counsel agreed upon procedures designed to afford all parties a full and fair opportunity to present their respective legal contentions in regard to the factual circumstances presented in this case. Accordingly, on December 13, 1982, we entered Orders Denying Motion to Compel, Granting Leave to File First Amended Complaint and Directing Further Proceedings in a manner agreeable to all parties. Pursuant to those Orders, plaintiffs filed the pending First Amended Complaint and Brief in Support of Plaintiffs' First Amended Complaint on January 26, 1983 and the pending motion for summary judgment.

## II. *The First Amended Complaint*

Order (2) of our December 13, 1982 Orders Directing Further Proceedings provided that "on or before January 26, 1983 plaintiffs will be permitted to file their First Amended Complaint, the first three (3) counts of which shall be identical to the first three counts of plaintiffs' pending complaint and which shall set forth in additional counts such other claims as plaintiff shall choose to allege under the circumstances." Plaintiffs did, however, add two new paragraphs to the "Allegations Common to All Counts," alleging as follows:

16. The aforesaid application for a UDA Grant was in writing and was duly authorized by the City Council by passage of appropriate ordinance.

17. At all times pertinent to this action, defendants, acting through their duly authorized agents, servants and employees represented and held out to plaintiffs that:

(a) All-Steel and CIT intended to perform the commitments set forth in the UDA Grant Applications filed by the City of Warrensburg with the Department of Housing and Urban Development upon the sole condition that said application be approved by HUD;

(b) All-Steel and CIT could and would perform the commitments set forth in the UDA Grant Applications filed by the City of Warrensburg with the Department of Housing and Urban Development without first obtaining the approval of RCA; and

(c) All-Steel and CIT continued to intend to perform the commitments set forth in the UDA Grant Applications filed by the City of Warrensburg with the Department of Housing and Urban Development even though CIT had merged with a subsidiary of RCA.

Counts II and IV of the First Amended Complaint are entitled "Malicious Interference." However, Count II alleges interference with contract against defendants RCA and CIT, while Count IV alleges interference with an "on-going business relationship," only against defendant RCA. Simi-

larly, both Counts III and V are entitled "Negligent Misrepresentation." Count V, however, incorporates by reference the specific alleged misrepresentations set forth in paragraph 17 (not 16, as Count V erroneously provided) of the "Allegations Common to All Counts." Moreover, Count V, allegedly based upon § 552 of the Restatement (Second) of Torts [Pls. Brief at 5], expands the allegations of Count III to allege not merely detrimental reliance upon misrepresentations, but also alleged that "said representations were made for the guidance of plaintiffs in their on-going business and contractual relationship with defendants CIT and All-Steel and for the guidance and support of plaintiffs in their application for a UDA Grant from HUD."

Count V further alleged that:

5. Defendants All-Steel and CIT failed to exercise reasonable care in obtaining and communicating that information to plaintiffs in that, among other reasons, they failed to use reasonable care to determine whether their ability to fulfill their commitments to plaintiffs would be affected by CIT's merger with a subsidiary of RCA and inform plaintiffs of this fact at any time; (2) [sic] they failed to inform plaintiffs that they would withdraw from the Warrensburg project because of deteriorations in the national economy; (3) said defendants failed to inform plaintiffs what constituted a change in economic conditions that would precipitate their withdrawal from the Warrensburg project; and (4) said defendants failed to inform plaintiffs of the direction of RCA not to proceed further with the Warrensburg project.

Count VI of the First Amended Complaint, entitled "Fraud," similarly alleges that defendants CIT and All-Steel made the representations set forth in paragraph 17 (not 16) of the "Allegations Common To All Counts," and that:

4. The aforesaid representations were false and defendants All-Steel and CIT and each of them knew that the aforesaid representations were false when made. Despite this knowledge, defendants con-

spired to deceive plaintiffs and made such representations knowingly, willfully, intentionally, deliberately and maliciously to induce plaintiffs to spend money for the purchase and preparation of and improvements to the permanent and temporary sites of defendants' proposed facilities in Warrensburg and applying for a UDA Grant as aforesaid.

5. At the time defendants made the representations described above, both CIT and All-Steel had the intent not to perform as they represented to plaintiffs.

Count VII, entitled "Prima Facie Tort," is directed against "all defendants" and alleges that defendants' actions "in causing All-Steel and CIT to withdraw from the Warrensburg project" were done "intentionally, knowingly, willfully and maliciously, after internal analysis and considered decision" and were without just cause and excuse "because, among other reasons, All-Steel needed the Warrensburg facilities immediately so that it could meet its pending orders and maintain its position in the market place." Count VIII, entitled "Promissory Estoppel," is directed against defendants All-Steel and CIT and based upon Restatement of Contracts, § 90. [Pls. Brief at 8–9]

The First Amended Complaint attached exactly the same exhibits that were attached to plaintiffs' original petition. Exhibit 1 is a letter dated November 29, 1979 from Robert L. Strawbridge, Chairman of the Board of All-Steel, to Mayor Hudson of the City of Warrensburg. Exhibit 2 is a letter dated January 14, 1980 from Strawbridge to Wallace May, Esq., of the Department of Housing and Urban Development [HUD]. Exhibit 3 is a letter dated January 31, 1980 from Thomas E. Rice of All-Steel to Mr. Ervin E. Borchers, Vice President of Borchers and Heimsoth Construction Co., Inc. Exhibit 4 is a CIT resolution dated January 31, 1980. Exhibit 5 is an All-Steel resolution of same date.

In our November 10, 1982 Opinion, we noted that plaintiffs had made no claim in their original petition for restitution of any out-of-pocket expenses. [550 F.Supp. at 1375] We now note that plaintiffs have not

made any such claim in their First Amended Complaint.

### III. *Defendants' Motion for Summary Judgment And Plaintiffs' Suggestions In Opposition*

Rule 56(e) of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

See *United States v. Farmers Cooperative Co.,* 708 F.2d 352 (8th Cir.1983), for a case affirming summary judgment pursuant to Rule 56(e) because appellant did not meet "its burden of generating a fact issue on ... its affirmative defense of waiver and estoppel."

Defendants appropriately set forth fifteen specific facts as to which they contend there can be no genuine issue and pursuant to which they contend they are entitled to judgment as a matter of law on all eight counts of the First Amended Complaint.[1] Plaintiffs, in their April 11, 1983 suggestions expressly incorporated *in toto* their suggestions in opposition to defendants' first summary judgment motion filed August 2, 1982. Plaintiffs did attach a new affidavit of John Vinson, City Manager of Warrensburg, which, however, is "nearly word-for-word the same as those portions of the incorporated suggestions that are at-

---

1. The fifteen specific facts relied upon by defendants were stated as follows:

1. There is no writing or document that sets forth the consideration and the provisions of the alleged contract between plaintiffs and All-Steel, that is dated when made and that is subscribed by both plaintiffs and All-Steel, or their agents.

2. Prior to May 8, 1980, there was only one document from All-Steel addressed to an official of the City of Warrensburg and that document is the November 28, 1979 letter from Robert Strawbridge to Delores Hudson.

3. Every writing from All-Steel, including the November 28, 1979 letter, that was not merely exchanged among defendants and that concerned the terms and conditions being negotiated for the proposed plant, contains language that expressly provides either that the document itself is not to be construed as an offer by All-Steel or that All-Steel will not be legally bound in any way other than by the execution of formal legal documents.
In addition, those writings made clear that actually obtaining the grant was an essential condition to All-Steel's decision to expand in Warrensburg.

4. All-Steel is and was, at all times pertinent to this action, a wholly owned subsidiary of CIT.

5. On January 31, 1980, CIT and thereby All-Steel became wholly owned subsidiaries of RCA.

6. For business reasons, RCA decided to review carefully all proposed but uncommitted capital expenditures. As part of that study, RCA reviewed the manufacturing activities of its newly-acquired subsidiaries, CIT and All-Steel.

7. In mid-March, 1980, RCA first became aware of the proposal by its newly-acquired subsidiaries, CIT and All-Steel, to locate an All-Steel facility in Warrensburg.

8. RCA first requested alternative proposals to reduce the scope and the total investment for the proposed All-Steel expansion in mid-April, and various alternatives were presented by CIT and All-Steel to RCA executives in late April, 1980 and early May, 1980.

9. RCA was informed by CIT that no legally binding commitments had yet been incurred by CIT or All-Steel in connection with the proposed All-Steel expansion.

10. The decision was made by RCA to cancel the entire project in early May, 1980.

11. RCA's decision to cancel the project was based solely upon economic considerations.

12. Until RCA made the decision to cancel the All-Steel expansion in Warrensburg, All-Steel and CIT expected the full proposal would be approved by RCA.

13. Within 1 or 2 days of being informed of RCA's decision not to go ahead with the proposal, CIT and All-Steel representatives traveled to Missouri to tell plaintiffs of that decision. They so informed plaintiffs on May 9, 1980.

14. On May 6, 1980, the City of Warrensburg was formally notified by HUD that the City's application for a UDA Grant had received *preliminary* approval.

15. The Grant Agreement, forwarded to the City by HUD, on May 6, 1980 was never executed by the City of Warrensburg. No executed contract between HUD and Warrensburg ever existed.

tributed to the John Vinson affidavit." [Pls. Suggestions at 1–2] [2] Plaintiffs state they will "stand on their incorporated suggestions for their response to defendants' argument pertaining to legal standards applicable to ruling on Motions for Summary Judgment, and for their factual statement." [Pls. Suggestions at 2]

Plaintiffs' also attached to their April 11, 1983 suggestions Exhibit 301, By-Laws of All-Steel, Inc., in support of their legal argument that "shareholder approval was not required for the type of 'licenses, agreements and other instruments and legal documents' mentioned in the resolution of the Executive Committee of the Board of Directors of All-Steel which was passed on January 31, 1980 pertaining to a proposed 500,000 square foot Manufacturing Facility in Warrensburg" [Suggestions, p. 6]; Exhibit 302, entitled "An Ordinance Authorizing Sale of Land to Missouri Public Service Company for Construction of a Sub-Station in Warrensburg Industrial Center, Ordinance No. 1941," which is undated and unsigned but which bears the hand-written notation "App'd 12/10/79," in support of plaintiffs' contention that "plaintiffs . . . donated 3.6 acres of land to a power and light company" in reliance upon plaintiffs' alleged business expectancy; [Suggestions at 16]; and an affidavit of David Greenamyre, City Manager of the City of Warrensburg, in support of plaintiffs' damages contention in regard to the temporary facility

**2.** See 550 F.Supp. at 1388 n. 14, where we expressed our dissatisfaction with the blanket affidavit of John Vinson that plaintiffs had attached to their August 2, 1982 Suggestions. Moreover, we there concluded that "that affidavit does no more than attempt to support counsels' conclusory view of the factual circumstances which plaintiffs apparently hope to establish at trial."

**3.** In our Memorandum Opinion of November 10, 1982 we rejected defendants' contention that summary judgment be entered on Count II of the original petition simply because Count II of the original petition had alleged tortious interference only with a contract and not a business expectancy. [550 F.Supp. at 1380] On December 13, 1982, however, we granted plaintiffs leave to file a first amended complaint alleging all the claims that plaintiffs might choose to allege under the circumstances.

intended to lease for All-Steel in the event of final approval of the UDA Grant.

Summary judgment will be granted in favor of defendants on Count I for the reasons we stated in our Memorandum Opinion of November 10, 1982. Each of plaintiffs' remaining legal theories will be discussed in turn in the remainder of this Memorandum Opinion.

## IV. Tortious Interference With Business Expectancy

### A.

Both Counts II and IV of the First Amended Complaint, as noted, allege tortious interference. Count II, however, based on the original petition, alleges interference with contract against both defendants RCA and CIT, while Count IV alleges interference with business expectancy only against defendant RCA.[3]

Defendants contend the record does not raise any issue of material fact in regard to whether defendants acted without justification, an essential element of tortious interference under applicable Missouri law. See Francisco v. Kansas City Star Co., 629 S.W.2d 524, 533–34 (Mo.App.1981). Moreover, defendants contend the record does not raise any issue of material fact in regard to whether defendants acted with the requisite intention to interfere under the formulation stated in Francisco, supra, at 530 (quoting from Gerstner Electric, Inc. v.

Plaintiffs' nonetheless chose to allege interference with business relationship only against defendant RCA and not CIT. This is consistent with the intention plaintiffs expressed at the November 30, 1982 pretrial conference to drop both Count III (malicious interference against CIT) and Count VIII (third party beneficiary against All-Steel) from their originally proposed first amended complaint. [Tr. at 3–4] Neither of those counts is included in the pending First Amended Complaint. The factual issues that plaintiffs allege in regard to Counts II and IV of the First Amended Complaint relate solely to RCA's alleged motivation in causing All-Steel to withdraw from the project. Plaintiffs thus do not contend that defendant CIT was unjustified in its interference with All-Steel's business relationship with plaintiffs.

*American Insurance Co.,* 520 F.2d 790, 794 (8th Cir.1975)).

Plaintiffs rely upon *Nola v. Merollis Chevrolet Kansas City, Inc.,* 537 S.W.2d 627, 634 (Mo.App.1976) in support of their contention that material facts are in dispute with regard to the element of absence of justification. *Nola* is said to support "The rule that shareholder interference must be to protect the corporation and not for the personal benefit of the shareholder ...." [Pls. Suggestions at 13]. Plaintiffs also rely upon the following cases said to be in accord with the rule of *Nola: Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188, 1198 (E.D.Mo.1980), *rev'd on other grounds,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 1084, 102 S.Ct. 512, 641, 70 L.Ed.2d 384, 619 (1981); *Calhoun v. Falstaff Brewing Corp.,* 478 F.Supp. 357, 360 (E.D.Mo. 1979); and *Stanfield v. National Electric Contractors Ass'n,* 588 S.W.2d 199, 202 (Mo. App.1979).

In earlier stages of this litigation, defendants relied upon *Nola* to support a quite different argument. Defendants originally cited *Nola* to support a contention that "no claim for contractual interference can arise from directions of a parent to its 100 percent-owned subsidiary." We rejected that contention, noting that "*Nola* does not even cite the leading Missouri case of *Downey v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976 (1953), in which Missouri first adopted the rationale of Section 766 of the Restatement of Torts." [550 F.Supp. at 1380] Defendants, however, no longer advance that narrow contention, but rather contend that their actions were justified as in protection of a bona fide legal economic interest implicated in the proposed Warrensburg project.

Plaintiffs' present reliance upon *Nola* and its progeny is indicative of plaintiffs' view that any justification in this case must arise solely from RCA's purported interest as a shareholder in All-Steel. Thus plaintiffs somewhat inconsistently contend that "RCA was not a shareholder in All-Steel at any of the times material herein," and that RCA's interference was unjustified because "the rule that one interested as a shareholder in a corporation is justified or privileged in inducing the corporation to terminate a business relationship, or breach a contract, is qualified by the provision that no improper means may be used and that the shareholder interfering with the business relationship must act in good faith to protect the corporation, and may not act for its or his own personal benefit." [Pls. Suggestions at 12]

■ Missouri law does not support plaintiffs' constricted view of the circumstances that may be said to constitute justification for interference with a contract or business expectancy. For it is well established in Missouri that one with a bona fide legal economic interest to protect is privileged to prevent performance of the contract which threatens that economic interest. *Francisco, supra,* at 543; *Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 282 (Mo. App.1978). The cases cited by plaintiffs are not to the contrary.

*Juengel Construction Co. v. Mt. Etna, Inc.,* 622 S.W.2d 510 (Mo.App.1981), cited by plaintiffs, does not support plaintiffs' argument. Mt. Etna owned Grasso Plaza, a shopping center in St. Louis County. In February, 1976, Mt. Etna as lessor and National Supermarkets, Inc., as lessee executed a lease which provided for the remodeling of the National store on the plaza, with Mt. Etna to pay the construction costs up to $400,000 and National to pay the excess. On May 3, 1976, Juengel Construction Co. signed a contract as general contractor with Mt. Etna, which provided that Juengel would perform to the specifications of Hastings & Chiretta Architects, with Mt. Etna and National entitled to name the subcontractors and suppliers to submit bids for the project, and to jointly decide which of the sub bidders would be awarded the contract.

Thereafter, Juengel prepared a list of subcontractors for the approval of Mt. Etna and National and began demolition of the area to be renovated. After the summer, Hastings & Chivetta completed the project's plans and forwarded them to

Juengel, which in turn invited subcontractor bids. After Juengel had received the bids, the parties met in September. National objected that the overall price of the project was too high, but said nothing regarding subcontractor bids.

Shortly after this meeting, National abruptly informed the Grassos (owners of Mt. Etna) and Juengel of its intention to rebid the entire project. National promptly directed Hastings & Chivetta to invite new bids for both general and subcontractor positions. The lowest of those bids, however, only slightly reduced the cost that Juengel had proposed.

The Missouri Court of Appeals, Eastern District, began its analysis of the justification question by noting that "One recognized justification for prevention of a contract arises when the contract threatens a present, existing economic interest, such as a pecuniary interest in the activities of the party who is induced to breach the contract with another. *Pillow v. General American Life Insurance Co.,* 564 S.W.2d at 282." *Juengel,* 622 S.W.2d at 516. Thus, the court recognized that "National had a financial interest in the contract between Juengel and Mt. Etna in that it was obligated to pay construction costs over $500,000."

The court concluded, however, that "the contract did not threaten National's pecuniary interests nor justify National's interference with the contract to protect them." The court noted that "National's immediate reaction to Juengel's bid compilation ... was that it was too high," but that "[p]romptly directing Hastings & Chivetta to invite new bids, National refused further negotiations with Juengel or Mt. Etna." The court emphasized that it was no more "than mere conjecture on National's part

that it could receive lower bids," and that National's interference was "arbitrary and whimsical." 622 S.W.2d at 516. Accordingly, the court held that Juengel had met its burden of proving absence of justification.

Significantly for the case at bar, the Juengel court distinguished *Zoby v. American Fidelity Co.,* 242 F.2d 76 (4th Cir.1957), a case relied upon by National, on two separate grounds. First, that *Zoby* did not involve an existing, partially performed contract, entitled to greater protection than a mere expectancy of contract under *Downey v. United States Weather Proofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976, 980 (1953); and second, that in *Zoby* the defendants' interference was not based on mere speculation but rather upon concrete figures reflecting a substantial monetary difference between two offers.[4]

*Juengel* is consistent with the Eighth Circuit's analysis of applicable Missouri law in *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 702 F.2d 719 (8th Cir.1983). Crowley sued NVF and Sharon for interference with Crowley's contract with Macomber. The only damages Crowley alleged were the attorney's fees it incurred when it successfully sued Macomber for breach of contract. The district court concluded that, as NVF and Sharon wholly owned Macomber, the fees Crowley incurred in suing Macomber were not incurred in "collateral litigation" and could not be recovered as a separate item of damage in connection with the tortious interference claim. The Court of Appeals reversed, reasoning that "Corporations are separate legal entities and ordinarily are to be regarded as such." The Court of Appeals, however, emphasized, that:

---

**4.** *M.J.S. Resources, Inc. v. Circle G Coal Co.,* 506 F.Supp. 341 (E.D.Mo.1980), another case in which absence of justification was found to exist, does not sustain plaintiffs' argument in this case. The facts in that case reflected that Rochester, part owner of the Hemisphere tract, contacted Shaffer, an attorney experienced in tax shelters, regarding a coal mining venture thereupon. Circle G Coal Company was to mine the coal. Circle G, however, never did so but instead sold its assets to S & S Realty

Company. The district court found that there was no enforceable contract to mine the coal, but that S & S had induced Circle G to terminate its existing business relationship by acquiring Circle G's assets. Further, the court found that, by analogy to *Downey, supra,* S & S's actions were not justified in that it had not acted to protect an existing economic interest in Circle G under *Pillow, supra,* and the actions of S & S were taken with full knowledge of the possible consequences.

Sharon and NVF are already substantially protected. One of the elements of tortious interference with contractual relations is the absence of legal justification. A corporation with a financial interest in another corporation is deemed to be justified unless it is shown that the parent employed wrongful means or acted with an improper purpose. Restatement (Second) of Torts § 769; *Pillow v. General American Life Insurance Co.,* 564 S.W.2d 276, 282 (Mo.App.1978) (*Pillow*). This rule provides a parent with a great deal of protection from liability for directing its subsidiary's actions.[5]

### B.

■ Inquiry must therefore be directed to whether RCA had a bona fide legal economic interest to protect and whether RCA acted to protect that interest under the undisputed facts and circumstances of this case.

It can hardly be doubted that RCA had a bona fide legal economic interest implicated in the proposed Warrensburg project. CIT, RCA's wholly owned subsidiary, would have been required to guarantee $10,000,000 worth of IDA bonds to finance the proposed facility, to loan its wholly owned subsidiary, All-Steel, not less than the aggregate sum of $8,000,000, the anticipated balance of the cost of constructing and equipping the facility in excess of the IDA bond proceeds, and to loan All-Steel up to an additional $10,-000,000 in interim financing. *See* CIT Resolution of January 31, 1980.

Plaintiffs have not suggested that RCA used any wrongful means in this case, such as illegal boycott, restraint of trade, or breach of fiduciary duty. Plaintiffs' basic contention is that an issue of material fact is created by plaintiffs' assertion that RCA acted in its own, rather than All-Steel's, interest. We find and conclude that such an assertion does not create any issue of material fact for the reason that we find and conclude that the material issue under applicable Missouri law is not whether RCA acted in its own, as opposed to All-Steel's, interest, but rather whether RCA had a bona fide legal economic interest to protect in this case and whether it acted to protect that interest under the undisputed facts and circumstances of this case. The record uniformly so indicates and plaintiffs have not borne their burden of adducing specific facts to the contrary under Rule 56(e), Fed. R.Civ.P.

■ As in *Francisco, supra,* we are satisfied that, under the factual data upon which plaintiffs rely, we would be required to direct a verdict in favor of defendants at the close of plaintiffs' case. Accordingly, summary judgment will be granted in favor of defendants in regard to Counts II and IV of the First Amended Complaint. *See Roberts v. Browning,* 610 F.2d 528, 531–32 (8th Cir.1979).[6]

---

5. Restatement (Second) of Torts § 769, cited by the Court of Appeals in *Sharon Steel Corp.,* provides:

*Actor Having Financial Interest in Business of Person Induced*

One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he

(a) does not employ wrongful means and

(b) acts to protect his interest from being prejudiced by the relation.

6. In light of our disposition of the justification issue, it is unnecessary that we reach the question of resulting damages or treat in any detail the issue of intent under *Francisco* and *Gerstner, supra.*

Under *Francisco* and *Gerstner,* however, intent is a separate issue from absence of justification. Plaintiffs obviously contended in their incorporated suggestions that the facts permit the inference that "All-Steel, CIT and RCA believed a legally binding commitment had been incurred" in order to create what they contend should be considered to be an issue of material fact in regard to RCA's intent. We do not believe that those incorporated suggestions permit such an inference. Nor do we believe that any such inference, even if it could be drawn, could be said to establish that defendants knew their interference was wrongful. Under Missouri law there are situations in which interference with contract or business expectancy is not wrongful, and we have concluded that this is one of them. Plaintiffs have therefore failed to establish the element of intent under *Gerstner* and *Francisco.*

### V. Negligent Misrepresentation

#### A.

■ Plaintiffs based their negligent misrepresentation claims upon Restatement (Second) of Torts, § 552. [Pls. Brief in Support of First Amended Complaint at 5]. The Supreme Court of Missouri has never passed directly on the question of whether Missouri recognizes a cause of action for economic loss caused by negligent misrepresentation. *Huttegger v. Davis,* 599 S.W.2d 506, 514–15 (Mo.1980) (Welliver, J. dissenting). However, the Missouri Court of Appeals, Eastern District did recognize such a cause of action in *Ligon Specialized Hauler, Inc. v. Inland Container Co.,* 581 S.W.2d 906 (Mo.App.1979). *See also Springdale Gardens v. Countryland Development Co.,* 638 S.W.2d 813 (Mo.App.1982); *William v. Holliday Cord Associates, Inc.,* 349 F.2d 490 (8th Cir.1965). *Cf. Clark v. City of Humansville,* 348 S.W.2d 369 (Mo.App.1961) (*sui generis* contractor's tort against city for misrepresentation of work to be done on bid project). We believe that *Erie* requires that we must apply the rule of decision stated the Missouri Courts of Appeals decisions.

Plaintiffs, however, have never been very specific about the alleged misrepresentations upon which they allegedly base their claims. For example, in our Memorandum Opinion of November 10, 1982, we referred to plaintiffs' unsupported contention that "the basic question will be the accuracy of the representation made by All-Steel and CIT that an All-Steel Manufacturing facility would be built in Warrensburg Industrial Park according to the terms of the documents submitted to HUD by the parties" and that "there can be a jury question of misrepresentation from the simple act of passing corporate resolutions on January 31, 1980 to bind a deal that could not go forward without RCA approval." [550 F.Supp. at 1385] Plaintiffs' April 11, 1983 Suggestions merely incorporated the discussion at pages 48–50 of their August 2, 1980 Suggestions, adding the "notation" that:

In October of 1979, All-Steel learned from Wally May, in the presence of Warrensburg representatives, that its commitment to the project could not be subject to favorable economic conditions. (John Vinson Affidavit) That condition was not asserted by All-Steel thereafter. At various times in the transaction, All-Steel would apparently agree that there would be no condition to going forward with the project, other than the grant, once the details of the transaction had been agreed upon by the parties. To continue to be part of an application for a grant to support a project after being told that the commitment to the project could not be subject to favorable economic conditions, constitutes a representation by All-Steel that their commitment was not subject to favorable economic conditions.

It would seem, however, from pages 47, 119 and 120 of Mr. French's deposition, that All-Steel officers had been under direction from Mr. Holmes, a member of All-Steel's Board of Directors from whom they apparently took direction, that All-Steel should always reserve the right to stop the project because of economic conditions.

If those All-Steel representatives who made representations on behalf of All-Steel that the project would go forward, subject only to the acquisition of the grant, did so without taking the time to learn All-Steel's formal position with regard to economic conditions, then the misrepresentations that occurred were negligent misrepresentations. The reason announced by All-Steel for cancellation of the project was unfavorable economic conditions. (Vinson deposition, p. 38. August 5, 1981.) [Pls. Suggestions at 25–26]

■ A preliminary question of Missouri law is presented in regard to whether the courts of Missouri would recognize a cause of action based upon § 552 of the Restatement under the circumstances of this case. Section 552 of the Restatement (Second) of Torts provides in pertinent part:

> § 552. *Information Negligently Supplied for the Guidance of Others*

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Comment (a) to § 552 distinguishes an action for misrepresentation from an action for deceit in that the former assumes a duty of care while the latter requires only honesty, i.e., "that the maker of a representation speaks in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says."

Section 552 must be considered in light of Section 530, Restatement (Second) of Torts, entitled "Misrepresentation of Intention," which provides:

(1) A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.

(2) A representation of the intention of a third person is fraudulent under the conditions stated in § 526.

Paragraph (b) to the Comment on Subsection 530(1), provides:

b. *To be actionable the statement of the maker's own intention must be fraudulent, which is to say that he must in fact not have the intention stated. If he does not have it, he must of course be taken to know that he does not have it.* If the statement is honestly made and the intention in fact exists, one who acts in justifiable reliance upon it cannot maintain an action of deceit if the maker for any reason changes his mind and fails or refuses to carry his expressed intention into effect. *If the recipient wishes to have legal assurance that the intention honestly entertained will be carried out, he must see that it is expressed in the form of an enforceable contract, and his action must be on the contract.* (emphasis added)

*See Dillard v. Earnhart,* 457 S.W.2d 666, 670–71 (Mo.1970) (quoting and relying upon the similar comment to First Restatement of Torts § 530). Paragraph (c) of that Comment, entitled "Misrepresentation of intention to perform an agreement," specifically states that "If the agreement is not enforceable as a contract, as when it is without consideration, the recipient still has, *as his only remedy,* the action in deceit under the rule stated in § 525 [Liability for Fraudulent Misrepresentation]." (emphasis added)

Paragraph (e) to the "Comment on Subsection (2)," on the other hand, provides that *"When the intention misrepresented is that of a third person,* it stands on the same footing as any other representation of an existing fact. The maker is subject to liability in an action of deceit only if the misrepresentation is fraudulent, as that term is defined in § 526. If it is honestly made, there is no liability in deceit, although *there may still be liability in an action for negligence under the rule stated in § 552,* or strict liability under the rule stated in § 552(c)." (emphasis added)

Unlike § 530, § 552 does not, by its terms, apply to misrepresentation of intention to perform an agreement. Nor do the illustrations to § 552 apply to other than typical cases of misrepresentation of factual, commercial information. The Comments to § 530 specifically state that where there is no viable action on the contract, the exclusive remedy for misrepresentation of intention to perform an agreement lies in the action for deceit. This is so because "[t]o be actionable the statement of the maker's own intention must be fraudulent, which is to say he must in fact not have the intention stated." A merely negligent misrepresentation of a maker's own intention is not actionable under § 530 for the reason that in the absence of any fraudulent intent as defined in the Comment on subsection 530(1), there is no misrepresentation of any *existing fact* on which any action for negligent misrepresentation could be based.

Applicable Missouri law is in accord with § 530 of the Restatement. *See Pinken v. Frank,* 704 F.2d 1019, 1026 (8th Cir.1983); *White v. Mulvania,* 575 S.W.2d 184, 188 (Mo. banc 1978) (*citing Dillard, supra*); *Wallach v. Joseph,* 420 S.W.2d 289, 295 (Mo. 1967), *cert. denied* 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967); *Musser v. General Realty Co.,* 313 S.W.2d 5, 10 (Mo.1958)). The action for misrepresentation of intention to perform an agreement is a recognized exception to the general rule under Missouri law that "[T]he giving of ... a promise, even though breached the next day, is not such a fraudulent misstatement of fact as will support an action for tortious fraud. The misrepresentation must be of existing fact." *Parthenopoulos v. Maddox,* 629 S.W.2d 563, 568 (Mo.App.1981) (citing *McGuire. v. Bode,* 607 S.W.2d 165, 167 (Mo. App.1980); *Klecker v. Sutton,* 523 S.W.2d 558, 562 (Mo.App.1975)). *See also Citizens Bank of Windsor v. Landers,* 570 S.W.2d 756, 761 (Mo.App.1978).

### B.

■ Our conclusion that under applicable Missouri law there can be no cause of action for negligent misrepresentation of a maker's own intention to perform an agreement is required by the decision of the Supreme Court of Missouri, sitting en banc, in *International Plastics Development, Inc. v. Monsanto Co.,* 433 S.W.2d 291 (Mo.1968), a decision most recently cited in *Francisco, supra,* at 534, in support of the Missouri rule of decision that "The exercise of the 'lawful right to negotiation' is a protected activity as long as the negotiations are not inherently improper."

International Plastics alleged in the cited case that in June, 1962, at the request of Monsanto Corporation, it submitted samples of its product for Monsanto's examination and that subsequently International furnished Monsanto with its patent applications for analysis. Thereafter Monsanto undertook negotiations with International, the ultimate objective being Monsanto's acquisition of International's stock. Those negotiations culminated in International su-

ing Monsanto for (1) breach of oral agreement, (2) malicious interference with business relations, and (3) for negligence. The trial court sustained Monsanto's motion to dismiss all three counts of the petition for failure to state claims upon which relief could be granted, and the Supreme Court affirmed.

Count Three of the petition in *International Plastics,* in terms strikingly similar to plaintiffs' allegations in the case at bar, alleged that "in September, 1962 Monsanto 'was possessed of all facts upon which it based its decision in March, 1963, to discontinue its relationship with plaintiff, International, but *it did negligently fail to advise plaintiff* International *of said facts or of its intention to discontinue such relationship,* and did negligently lead said plaintiff to believe that such relationship was permanent,' causing plaintiffs the loss of 'opportunity to issue franchises for the promotion and sale of the product' to its damage of $500,000.00." [433 S.W.2d at 296–97] (emphasis supplied by Supreme Court of Missouri).

International contended that: "The gravamen of the negligence charged was in failing to advise International of its intention to sever the relationship at a time when such severance would not have resulted in the complete destruction of International's business." [p. 297] International further contended that "Where one party to the negotiations is aware that a delay in its decision will have the effect of injuring, or in this case, destroying, the other party to the negotiations and when that party has all facts necessary to make such determination, *his negligent failure to arrive at a decision and his negligent leading-to-believe that a certain result will ensue constitutes actionable negligence.*" [*Id.*] (emphasis supplied by Supreme Court of Missouri).

The Supreme Court of Missouri, noting that "it was not charged that there was fraud in their 'negotiations' in any actionable sense" [p. 296], held that Count III "runs afoul of somewhat obscure but certainly recognized principles ... and therefore does not state a cause of action on any

theory. In essence the allegations of Count III 'deals only with the liability for harm caused to a person by a mere refusal to enter into business relations with him.' 4 Restatement, Torts, p. 36." [p. 297] Referring by analogy to "the general rule ... that liability for the interference even with existing contracts cannot be based on merely negligent conduct," (quoting 1 Harper & James, Torts, § 6.11, at 513) the Supreme Court of Missouri stated that "By the same token, it may be interpolated, mere negotiations and 'expectation that a contract will be entered into and the fact that negotiations have been made to carry that expectation in effect do not constitute a contract.' 1 Williston, *Contracts,* Sec. 27, p. 66." [p. 298] The court concluded that Count III gave rise to no liability because "stripped of all but its essence, Count III charges as negligence only that Monsanto exercised its legal right to terminate at best the tenuous relationship of mere 'negotiation.'" [*Id.*]

■ We find and conclude for the reasons stated that Counts III and V of the First Amended Complaint fail to state a claim upon which relief can be granted under applicable Missouri law. Accordingly, summary judgment will be granted in favor of defendants on Counts III and V of the First Amended Complaint.[7]

## VI. *Fraud*
### A.

Count VI of the First Amended Complaint, like Counts III and V, incorporates paragraph seventeen of the "Allegations Common to All Counts." Similarly, plaintiffs make reference to the alleged fact that "All-Steel's President, Mr. French, was under direction from a member of the Board of Directors (Mr. Holmes) to reserve the state of the economy as a condition to any

commitment. This was not done." Indeed, plaintiffs suggest that "with regard to plaintiffs' fraud count, the question will be almost the same as stated for negligent misrepresentation." Thus, plaintiffs contend that "If the deceit was intentional, instead of negligent, a fraud was committed." [Pls. Suggestions at 28–29]

Plaintiffs, rather than directing attention to specific facts with appropriate citation to the record to demonstrate that a genuine issue exists for trial, as required by Rule 56(e), instead advance various legal contentions in regard to the significance of specific facts or documents. For example, in regard to defendants' specific fact two, plaintiffs assert that "The addressee of written representations is of no consequence if All-Steel and CIT knew and intended that plaintiffs rely on the representations being made by All-Steel and CIT to HUD." [P. 3] In regard to fact three, plaintiffs contend that oral representations allegedly made by Wally May of HUD in regard to the content of an appropriate "commitment letter" were legally binding on All-Steel and CIT.

We find and conclude that plaintiffs' legal contentions do not establish the existence of any genuine issue of material fact precluding entry of summary judgment on Count VI for reasons we shall now state. Inasmuch as plaintiffs have reiterated legal contentions earlier raised in connection with defendants' first summary judgment motion, it is appropriate, however, that we reiterate our previous conclusion that:

Plaintiffs do not attempt to put those facts in issue. Rather, plaintiffs, without reference to any factual data in the record, attempt to describe the November 28, 1979 letter as "All-Steel's original commitment letter" (Pls.' suggestions in

---

**7.** Defendants contended in their suggestions in regard to negligent misrepresentation that (1) the representations made were not false; (2) plaintiffs' asserted reliance was unjustifiable; (3) plaintiffs were contributorily negligent; and (4) plaintiffs incurred no injury. Contentions (1) and (2) will be discussed in the next section of this Memorandum Opinion in connection with plaintiffs' claim for fraud. We do not find

it necessary to discuss the issue of contributory negligence because we reject the notion that liability may be imposed on a negligent misrepresentation theory under the undisputed factual circumstances of this case. We also find it unnecessary to discuss plaintiffs' damages contentions inasmuch as no cause of action has been stated.

opposition, p. 10); the January 14, 1980 letter as All-Steel's "subsequent commitment letter" (Ibid, p. 12); and the January 31, 1980 corporate resolutions passed by All-Steel and CIT as "gold-plated" commitments (Ibid, pp. 20–21). Plaintiffs also present an involved and inaccurate description of the legal significance and requirements of the HUD procedures and the various documents filed with HUD in connection with Warrensburg's effort to obtain a UDA grant (Ibid, p. 35 et ff.). [550 F.Supp. at 1376]

## B.

As defendants correctly note, the HUD regulations governing the UDA Grant applications in this case quite clearly and expressly do not require that private developers and recipients either execute a written agreement or enter into a legally binding agreement as a precondition for consideration of the application by HUD. [Defs.' Reply Suggestions at 20–21] Title 24 C.F.R. § 570.456(c) (1978), under the general heading "Applications," provided:

(c) *Submission requirements.* Applications must be submitted on HUD forms to the appropriate HUD Area Office and must consist of the following:

\*  \*  \*  \*  \*  \*

(6) Evidence of commitment of public and private resources which will be available for completing the project, pursuant of § 570.457(e), (f), and (g). *Such evidence may be in the form of a letter of intent or a legally binding commitment* between the applicant and public/private entities. (Emphasis added)

Under the general heading "Criteria for selection," § 570.457(e) provided:

(e) *The nature and extent of financial participation by private entities in the proposed project.* No activities will be funded under this subpart unless there is a firm commitment of private resources to the proposed project. The private commitment must have a clear, direct relationship to the activities for which funding is being requested. The necessary private commitment must be identi-

fied in the application. Examples of acceptable forms of private commitment include the commitment of a company to remain in the locality if the company is financially committed to invest in expansion or modernization of its facilities, the commitment of a developer, or a commitment of financing from such lending sources as banks, savings and loan institutions, credit unions, pension funds, insurance funds, or other investors. The following characteristics will be considered in determining the nature and extent of financial participation by private entities:

\*  \*  \*  \*  \*  \*

(3) *Whether the private commitment is more firm than the other projects being considered for action grant funding.* (Emphasis added)

Under the general heading "HUD review and action on application," in § 570.458(c) provided:

(c) *Conditional approval.* The Secretary may make a conditional approval, in which case the grant will be approved, but the utilization of funds will be restricted. Conditional approvals will be made for purposes including, but not limited to, the following:

\*  \*  \*  \*  \*  \*

(2) *To ensure that the applicant secures legally binding commitments* of private resources pursuant to § 570.-456(c)(6); . . . (Emphasis added)

Finally, § 570.459(a) provided:

§ 570.459 *Post-approval requirements.*

(a) *Submission of evidence of private commitment. Recipients must submit to the HUD Area Office evidence of legally binding commitments from private entities identified in the application pursuant to § 570.456(c)(6).* Recipients must also submit an opinion of counsel that the commitments are legally binding under State and local law and conform to the grant agreement executed by HUD and the recipient. No costs may be reimbursed under the grant agreement prior

to HUD receipt of such evidence. (Emphasis added)

Defendants in this case clearly submitted evidence of commitment of private resources only in the form of letters of intent and not by any legally binding commitment; for the obvious fact is that those letters of intent, which speak for themselves, do not purport to be legally binding but rather make explicit reference to the appropriate legal documents which were later to be forthcoming in the event that the grant application would have been approved. Indeed, it is undisputed that the grant application was only conditionally approved for that very reason.

Exhibit E to the Grant Agreement conditionally approved in this case [Defs. Ex. 2 filed July 2, 1982], set forth the "Required Evidentiary Materials" yet to be submitted, including legally binding written agreements between the parties. Exhibit F to the Grant Agreement, the "Project Performance Schedule," set forth the specific dates for submission of those required evidentiary materials. Section 3.04(b) to the Grant Agreement provided:

(b) If Exhibits E or F to this Grant Agreement do require or authorize the phasing or staging of the Recipient's draw of funds, then upon a finding by the Secretary that the Recipient has submitted, in a timely manner and in acceptable form and content, all of the evidentiary materials specified and required at said Exhibit E to be submitted to and accepted by the Secretary respecting any particular phase or stage of the draw of funds; *and upon acceptance and approval by the Secretary of said evidentiary materials;* and if no event of default has occurred, as defined at subsection (a) of Section 7.01 of this Grant Agreement, the Secretary shall promptly issue to the Recipient a written authorization to draw funds under the Letter of Credit in accordance with any requirements or authorizations described at said Exhibit E respecting the particular phase or stage of the draw of funds. (Emphasis added)

We find and conclude, under applicable Missouri law, that the letters of intent and the January 31, 1980 corporate resolutions of All-Steel and CIT were submitted in connection with the UDA Grant application as evidence of a non-binding commitment of private resources to the proposed project. We further find and conclude that the UDA Grant application in this case neither bound, nor purported to bind, anyone to anything. *See United States v. Kyte,* 705 F.2d 967, 969 (8th Cir. 1983) (quoting *Standard Meat Co. v. Taco Kid of Springfield, Inc.,* 554 S.W.2d 592, 594 (Mo.App.1977)).[8]

---

8. Wally May, senior development director with HUD serving the office of UDA Grants, upon whose oral representations plaintiffs attempt to place so much reliance, testified at his deposition that the "commitment letters" required as part of the UDAG application meant exactly what the regulations say they meant:

Q. (By Mr. Beerbower) Mr. May, as of late January, 1980, were you in a position to request that the parties submit to you executed documents setting forth legally binding agreements? Did you have the power to do that?

A. The requirements with regard to submission of legally binding commitments are as indicated in the regulations set forth in the Grant Agreement. The regulations are published in the Federal Register, available for all parties to read, including the City of Warrensburg, the developer C.I.T. and the developer All-Steel. That is the answer to that question, sir. I did not, I am not in a position to order anybody to do anything.

It is the regulations and the contract that prescribe the behavior in this instance.

Q. Well, my question was whether you had the power to request it in order to provide a strongly competitive application?

A. Without being contentious, obviously, I prepared the Grant Agreement and if the Grant Agreement to the extent of the Grant Agreement requests the submission of the legally binding commitments, the answer to your question is yes. But ultimately again, that power, the power to request is something that arises from the regulations and the contract, and the contract is issued by the Department of Housing and Urban Development under the secretary's signature and that is the framework that I was trying to deal with.

Q. I understand that, and there may have been a misunderstanding. My question was, could you have, if you had decided it was the wise course, have asked for those legally binding agreements prior to the

### C.

To establish actionable fraud, plaintiffs must prove that defendants All-Steel and CIT intentionally misrepresented their intention to perform in accordance with the agreement alleged in this case. *See, e.g., Pinken v. Frank, supra.* Moreover, under applicable Missouri law, negotiation, so long as not inherently improper, is a legally protected activity. *International Plastics, supra.* Defendants' mere participation in the grant application procedure cannot, in the absence of otherwise actionable fraud, be considered wrongful or actionable under Missouri law.

Plaintiffs have not directed attention to any specific facts which suggest that a genuine issue is presented in regard to whether defendants, in fact, made any of the alleged misrepresentations set forth in paragraph 17 of the "Allegations Common to All Counts." We have already stated our conclusion that the letters of intent and the January 31, 1980 corporate resolutions of All-Steel and CIT were exactly what they purported to be, and what the applicable federal regulations required them to be, and nothing more. We further find and conclude that those letters and resolutions cannot be said to establish any of the alleged misrepresentations of fact set forth in paragraph 17 of the "Allegations Common to All Counts." Nor can defendants' mere participation in the UDA Grant application procedure be said to establish any of the alleged misrepresentations of fact set forth in paragraph 17 of the "Allegations Common to All Counts" under applicable Missouri law.

Plaintiffs have failed to set forth any specific fact showing that there is a genuine issue for trial in regard to whether defendants entertained any fraudulent intention not to go forward with the proposed Warrensburg project at the same time the contrary intention was expressed. That precisely the opposite is true is evidenced by the fact that, as plaintiffs themselves recognize, efforts by CIT and All-Steel to save the project continued into May of 1980. Merely intoning that "if the deceit was intentional, instead of negligent, a fraud was committed," cannot be said to satisfy the mandate of Rule 56(e), Fed.R.Civ.P.

For the reasons stated, we find and conclude that there is no genuine issue of fact and that as a matter of law, summary judgment should be entered in favor of defendants on plaintiffs' Count VI.[9]

### VII. *Promissory Estoppel*

Plaintiffs' Count VIII alleges "promissory estoppel" based on § 90 of the Restatement of Contracts. [Pls.' Brief in Support

---

submission of the application for preliminary approval?

A. Well, obviously I could as a human being ask for any number of things. As to whether there is any duty on the part of the person who receives that request to respond, I do not believe that I have that power under the regs and they are not thereby obligated to supply the material.

Q. Do you know whether that has ever happened—and again, I am just asking for your personal knowledge—on a grant application, that is where those documents have been provided in time for the secretary's approval?

A. Again, the legally binding commitments going to operative words within the Action Grant, legally binding commitments called for in the Grant Agreement as a result of the Grant Agreement, so functionally there is no call for legally binding agreements prior to a preliminary approval, prior to the Grant Agreement. [May Dep. pp. 170–72]

*See also,* to like effect, Franklin Depo. at 39–40.

9. What we have stated more than suffices to support our additional conclusion that any reliance plaintiffs may have had on defendants' alleged misrepresentations would have been entirely unwarranted under the circumstances. We therefore need not reach defendants' argument that under *Vochatazer v. Public Water Supply Dist.*, 637 S.W.2d 418 (Mo.App.1982), plaintiffs' reliance would in any event have been unreasonable as a matter of law because no contract existed in compliance with § 432.070 RSMo. *Cf., Kansas City v. Rathford*, 353 Mo. 1130, 186 S.W.2d 570, 575 (1945) (cause of action could be based on alleged fraudulent conspiracy notwithstanding § 432.070).

We note, however, our agreement with defendants that any alleged injury in the case was caused, not by any alleged misrepresentations of All-Steel and CIT, but rather by RCA's ultimate decision not to proceed with the project, a decision which RCA was entitled to make under applicable Missouri law.

of First Amended Complaint at 8–9] *See Feinberg v. Pfeiffer Co.,* 322 S.W.2d 163 (Mo.App.1959).

For two reasons, plaintiffs cannot recover under Count VIII. First and foremost, § 432.070 precludes recovery on this theory as a matter of law. *Kansas City v. Rathford,* 353 Mo. 1130, 186 S.W.2d 570 (1945), far from supporting plaintiffs' position, is clearly to the contrary. *Rathford* emphasized the fundamental purpose of § 432.070 to "safeguard against fraud and peculation, and specifically regulate the mode by which the business of a municipality is to be transacted." A contract in violation of that section is void *ab initio,* thus precluding any recovery based on ratification, estoppel, or implied contract. *See* 550 F.Supp. at 1375, citing cases in which the municipality was a plaintiff. *Feinberg, supra,* is not to the contrary.[10]

Moreover, we have already stated our conclusion that defendants made no promise in this case on which plaintiffs could rely. The January 31, 1980 resolutions, which plaintiffs refer to as "The ultimate in corporate representations" [Pls.' Suggestions at 19], were not in themselves promises, but simply authorizations to enter into contracts, which were, in fact, never executed. Similarly, neither the letters of intent nor defendants' participation in the UDAG application procedure, can be said to constitute any promise. The illustrations to the Restatement on which plaintiffs rely are inapposite.

For the reasons stated, we find and conclude that defendants are entitled to summary judgment in their favor with respect to Count VIII as a matter of law.[11]

VIII.

Accordingly, it is

ORDERED (1) that defendants' pending motion for summary judgment should be, and the same is hereby, granted. It is further

ORDERED (2) that the Clerk shall enter final judgment for defendants on a separate document in accordance with Rule 58, Fed.R.Civ.P.

---

10. *Feinberg* distinguished the doctrine of "promissory estoppel" from "equitable estoppel" or "estoppel in pais," *citing* Williston on *Contracts,* Rev.Ed., Sec. 139, Vol. 1. [322 S.W.2d at 168] The latter doctrine is equitable in nature and is applicable only where there has been misrepresentation of an existing fact, such as of intention. Professor Williston accurately stated that "As to such intention there is usually no misrepresentation and if there is, it is not that which has injured the promisee." We have so found in this case.

11. Plaintiffs' Count VII, alleging "prima facie tort" against all defendants, is untenable. In light of what has been stated, it is apparent that plaintiffs cannot establish the elements of intent to cause injury or absence of justification, even if they could establish damages. *See Boyer v. Carondelet Sav. & Loan Ass'n.,* 633 S.W.2d 98 (Mo.App.1982); *Wilt v. Kansas City Area Transit Authority,* 629 S.W.2d 669 (Mo. App.1982); *Porter v. Crawford & Co.,* 611 S.W.2d 265 (Mo.App.1981).