No. 82,611

RAYMOND WILKINSON, *Appellee/Cross-Appellant,* v. SHONEY'S, INC., a/d/b/a CAPTAIN D'S SEAFOOD, and NEC, INC., *Appellants/Cross-Appellees.*

(4 P.3d 1149)

Opinion filed April 28, 2000.

*Jack L. Whitacre*, of Spencer Fane Britt & Browne LLP, of Kansas City, Missouri, argued the cause, and *Michaela M. Warden*, of Spencer Fane Britt & Browne LLP, of Overland Park, and *William C. Martucci*, of the same firm, were with him on the briefs for appellant/cross-appellee Shoney's, Inc.

*J. Eugene Balloun*, of Shook, Hardy & Bacon L.L.P., argued the cause, and *David J. Waxe* and *Barbara A. Harmon*, of the same firm, were with him on the briefs for appellant/cross-appellee NEC, Inc.

*Brian J. Niceswanger*, of McDowell, Rice, Smith & Gaar, of Overland Park, argued the cause, and *Richard W. Holmes*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, was with him on the briefs for appellee/cross-appellant Raymond Wilkinson.

The opinion of the court was delivered by

LARSON, J.: Raymond Wilkinson sued Shoney's and its agent in unemployment compensation matters, National Employers' Council, Inc. (NEC), after being fired from his management position at Shoney's and having his unemployment benefits claim challenged. Wilkinson alleged claims for defamation, malicious prosecution

(malicious defense), wrongful discharge/ breach of implied employment contract, and negligent misrepresentation. A jury awarded Wilkinson damages of $533,271 and recommended the imposition of punitive damages, which were assessed by the court in the amount of $800,000. Shoney's and NEC appeal, raising numerous issues. Wilkinson cross-appeals.

This matter has previously been before our court in *Wilkinson v. Shoney's, Inc.*, 265 Kan. 141, 958 P.2d 1157 (1998), where we dismissed that appeal as not being from a final judgment because the issue of the amount of punitive damages to be awarded had not been finally determined.

Our jurisdiction is pursuant to K.S.A. 20-3017 (transfer from the Court of Appeals).

We first consider Shoney's and NEC's challenges to the damage award for malicious defense and resulting punitive damages. We will later consider Shoney's contentions and arguments against the separate jury award for wrongful discharge and negligent misrepresentation. We will finally consider Wilkinson's cross-appeal. The facts relating to Wilkinson's various contentions are intertwined and we will set them forth generally with later elaboration as to particular issues.

*Factual background*

Shoney's and NEC entered into an agreement for NEC to represent Shoney's in responding to and defending against claims for unemployment compensation filed by Shoney's former employees. Shoney's was obligated to provide NEC with factual information regarding particular claims and NEC would make an appropriate response. NEC had the right to conduct its own investigation, obtain information from Shoney's management and employees, and arrange for witnesses at hearings. Although it was up to NEC to decide whether to contest a particular claim, Shoney's had instructed NEC to contest "any and all claims that [Shoney's] possibly can," and NEC challenged 75% to 80% of Shoney's unemployment claims.

Raymond Wilkinson and his wife, Rhonda, began working for Shoney's in the mid-1980's. Wilkinson entered the management

trainee program and, after working in various Shoney's restaurants in Kansas and Missouri, eventually advanced to the position of store manager. In August 1992, while serving as kitchen manager in a Topeka Shoney's, he quit after being verbally abused by his area supervisor, Tommy Burkett. Although Shoney's disputed Wilkinson's claim for unemployment benefits, the Kansas Department of Human Resources (KDHR) determined Wilkinson was eligible, and he was paid benefits.

Wilkinson then obtained employment at Bennigan's restaurant, initially as a cook, but later was promoted to a trainer's position. In June 1993, Wilkinson had a chance meeting with Shoney's regional director, Robert White, at a Shoney's in Missouri where Rhonda was working. White told Wilkinson that Shoney's had changed, and he should consider coming back to work for them.

After phone conversations between the parties and consideration of the offer, Wilkinson told White he would come back to work for Shoney's but that he needed to give Bennigan's 2 weeks' notice. White told Wilkinson that he had to appear before the Rehire Board that met in Raytown, Missouri, before he could be approved for rehire. White told Wilkinson to talk to Mike Tucker, the manager of the State Avenue store in Kansas City, Kansas, to see if they could "get together" and "if they wanted to work together and establish a starting date position and salary."

Wilkinson was approved by the Rehire Board and testified that he viewed this approval as meaning that once approved, he could not be penalized or treated unfairly for anything that had happened during a previous employment. When Wilkinson arrived for the first day of work at the Kansas City, Kansas, store, Tucker showed him the "Welcome to Shoney's Inc." poster that described various laws and rules applicable to employees, including Shoney's fair treatment guarantee and rehire policy. The poster states, in part: "You as an employee of Shoney's Inc., have certain rights. Realizing that problems do occur from time to time, we have prepared this poster to help you understand your rights. We want to make sure that you are always treated in a fair and consistent manner." Tucker also showed him a booklet containing Shoney's policies, including that of progressive discipline.

Under the "Fair Treatment Guarantee," the poster said: "Our Fair Treatment Guarantee provides that every employee, regardless of position, be treated with respect and in a fair and just manner at all times."

After being rehired, Wilkinson was promoted to kitchen manager and subsequently transferred to Shoney's Raytown, Missouri, store in October 1993 as assistant store manager.

Nineteen-year-old Jenny DeLapp worked as a waitress at the Raytown Shoney's. During a shift, Wilkinson was drawn into a conversation between DeLapp and the kitchen manager, Tracy Burrick. According to Wilkinson, DeLapp told them that men would not date her more than once because she would not "put out." Wilkinson said he replied to her in a joking manner that he would not go out with her either if he were single. Wilkinson stated that he perceived no indication that DeLapp felt harassed by his response.

On December 3, 1993, DeLapp's boyfriend complained that she had been sexually harassed during a conversation involving Wilkinson. When the lead dining room manager at the Raytown store, Carol Sutton, called DeLapp to inquire about the problem, DeLapp agreed to write her a letter to explain what had happened.

DeLapp's letter described Wilkinson's behavior during her shifts with him. She described Wilkinson as having asked her to go out after work and "get a room," and that he stared at her as she sorted silverware. She quoted several comments allegedly made by him that had implicit sexual overtones, and she described him as having had conversations with waiters about how to engage in sexual discrimination without getting caught.

Sutton conveyed the letter to management and informed her supervisor, Mickey Brown, about the complaint. Brown told Wilkinson about the allegations 2 days later and also told his superior, White, who directed another of Wilkinson's supervisors, Hossein Nikzad, to get information from Sutton and report the allegation to Shoney's headquarters in Nashville and its Equal Employment Opportunity (EEO) office.

H. Benny Ball, who was Shoney's executive vice president of human resources, sent Juanita Presley, Shoney's EEO Manager, to

investigate. She talked with Sutton and then spoke privately with Wilkinson who told her that he had stumbled into a conversation about DeLapp's dating which had been correctly described. Presley told him it was her obligation to make recommendations to her supervisor, and she did not know how the matter would turn out. Though her initial attempts to speak with DeLapp were unsuccessful, she did speak with several other Raytown employees.

While the investigation was still ongoing, Ball informed Shoney's regional vice-president, William Marstellar, about DeLapp's allegations. He learned from Ball that Wilkinson had worked the year before under another regional manager, Mike Cotter, at the Topeka store. Marstellar called Cotter, who told him that when Wilkinson worked for him, he had demoted Wilkinson from store manager to kitchen manager and then had fired him in 1992 because he did not keep a well-staffed, clean, well-operated store, and because he liked to party and come to work late. Marstellar asked if White had contacted Cotter for a reference before Wilkinson was rehired. Cotter said he had not been contacted and that he would not have rehired Wilkinson.

Marstellar called White and asked why he had not contacted Cotter for a reference prior to Wilkinson's rehire, and White said, he just had not. Marstellar decided then to terminate Wilkinson's employment even though the DeLapp investigation was not complete. He also terminated White's employment. Marstellar directed Nikzad to terminate Wilkinson's employment and assigned the code "management loss of confidence" as the reason for the termination.

Nikzad testified that he told Wilkinson on December 11, 1993, that he had been fired because of the allegations against him, but Wilkinson testified that Nikzad told him that it had been a decision by Marstellar in Nashville and that Nikzad did not know the reasons.

Wilkinson applied for unemployment benefits at the Division of Unemployment Security in Independence, Missouri, but the initial separation fact-finding report stated that Kansas was the state which was liable, and the matter was transferred to the KDHR. Wilkinson's application stated: "I was discharged . . . because

one of the female employees said that I had said something offensive to her. I did not know what it was. I asked Hossein what I was supposed to have said. He did not tell me. To the best of my knowledge I did not say anything offensive. I do joke around but I really don't know what I said." On December 14, KDHR sent notice of Wilkinson's benefits claim to NEC through Shoney's. They had 10 days to respond or be barred from protesting any decision regarding the claim.

The notice was received by NEC on December 17, 1993, and its claim analyst was unable to obtain detailed information including what DeLapp had said or Presley did. She noted this in her records with the statement " 'All I had to go on was sexual harassment. Waited on this from corporate office as long as we could. Had to respond.' "

NEC claims manager Nell Thomas became involved in the case on December 22, 1993, and had difficulty obtaining information because people were on vacation due to the holidays. Thomas said NEC at that point had reason to believe that Wilkinson was terminated for sexual harassment because they had been told so by Mickey Brown.

Presley received DeLapp's letter from Sutton on December 23, 1993, along with the statement that Wilkinson had been terminated for "manager loss of confidence."

The investigation by NEC continued although the response was made based upon what it then had available. It contended that Wilkinson was terminated pending investigation of sexual harassment and should be denied benefits. Attempts were made to contact DeLapp. Someone attempted to contact Marstellar but could not locate him, and there was testimony that the investigation had taken more time than usual because they could not locate people and could not obtain complete information.

When no additional evidence was presented, the KDHR rendered its decision on January 6, 1994, and determined that there was insufficient evidence that Wilkinson had been fired for intentional misconduct. He was cleared for benefits. The notice stated that the examiner's determination would become final 16 days after having been mailed unless it was appealed in writing to a referee.

Wilkinson testified that after Shoney's disputed his claim of un-employment benefits, he attempted to avail himself of Shoney's fair treatment guarantee by writing a letter to the regional director with a request that it be passed to either Marstellar or another high level manager. He claimed to have never heard from Shoney's.

Based on the investigation, Presley concluded that while Wilkin-son may not have violated federal law prohibiting sexual harass-ment, Shoney's policy of zero tolerance was stricter and he had violated their policy. Presley testified that had Wilkinson still been employed, she would have recommended terminating him for bad judgment as a manager in participating in sexual conversations and failing to discourage such conversations.

NEC appealed the examiner's decision on January 13, 1994. By that time, they had DeLapp's letter and attached it to the appeal notice with the statement, "It is the employer's position that the claimant was terminated for management loss of confidence per-taining to sexual harassment. It was brought to the employer[']s attention that the claimant was making unwelcome comments to fellow employees. This was investigated and the claimant was ter-minated for just cause."

A hearing was held on the matter attended by Wilkinson, Rhonda, Brown, DeLapp, Burrick, Mitchell, and an attorney for the employer. The referee determined there was evidence to show Wilkinson was fired for sexually harassing a waitress, but the ref-eree noted no corroboration of DeLapp's story. The referee de-termined that Shoney's had failed to show actions rising to the level of misconduct under K.S.A. 44-706(b), and affirmed the examiner's determination. Shoney's did not appeal further.

Wilkinson sued Shoney's and NEC in September 1994, alleging claims for wrongful discharge/breach of implied contract, negligent misrepresentation, outrage, negligent infliction of emotional dis-tress, and defamation. Wilkinson later amended his petition to al-lege claims for punitive damages, malicious prosecution, and loss of consortium on the part of Rhonda. The court granted summary judgment against Wilkinson on the claims of outrage, negligent infliction of emotional distress, and defamation. The remaining claims were submitted to a jury after the defendants' motions ini-

tially for summary judgment and at trial for directed verdict were denied. The jury returned verdicts for Wilkinson on all claims, awarded damages of $158,271 against Shoney's for the wrongful discharge and negligent misrepresentation claims; $300,000 against Shoney's for malicious prosecution; and $75,000 against NEC for malicious prosecution. After the first appeal was dismissed by this court as previously stated, punitive damages against Shoney's for malicious prosecution in the amount of $800,000 were ordered.

*Standard of review*

Many of the issues raised relate to rulings on motions for summary judgment, directed verdict, and trial rulings or legal issues which raise the following standards of review applicable to such rulings.

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. . . . . On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

"When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict." *Calver v. Hinson*, 267 Kan. 369, Syl. ¶ 1, 982 P.2d 970 (1999).

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court." *State v. Davidson*, 264 Kan. 44, 56, 954 P.2d 702 (1998); see *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1993).

Whether to adopt or recognize a new cause of action falling within the common law of tort or negligence is a question of law over which we have unlimited review. See *Bonin v. Vannaman,* 261 Kan. 199, 225, 929 P.2d 754 (1996); *OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 306, 314, 918 P.2d 1274 (1996).

*Should the trial court have granted NEC's and Shoney's motions for summary judgment and directed verdict/judgment as a matter of law on Wilkinson's claims of malicious prosecution (malicious defense)?*

Shoney's and NEC contend the tort of malicious prosecution, which we deem to be more correctly labeled as "malicious defense," has not previously been recognized in Kansas and the trial court erred in denying their motions for summary judgment and directed verdict on this claim. Wilkinson contends the malicious defense claim is justified based upon the initial contesting and later appeal of his claim for unemployment compensation benefits.

The landmark case in Kansas relating to malicious prosecution of a civil action is *Nelson v. Miller,* 227 Kan. 271, 607 P.2d 438 (1980), which contains a lengthy summary of the basic principles, some of which are hereinafter set forth:

"(2) To maintain an action for malicious prosecution of a civil action the plaintiff must prove the following elements:

"(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

"(b) That the defendant in so doing acted without probable cause.

"(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

"(d) That the proceeding terminated in favor of the plaintiff.

"(e) That the plaintiff sustained damages. [Citations omitted.]

"(3) In addition to the initiation of the prior action, it is sufficient if it is shown that the defendant continued or procured the filing of the action.

. . . .

"(8) In order to maintain an action for malicious prosecution, the plaintiff must prove that the defendant initiated the proceedings of which complaint is made without probable cause. . . .

"(9) Malice is an essential element of an action for malicious prosecution but it is not restricted to the personal hatred, spite, or revenge of the one who insti-

tutes the prosecution. It is enough if the prior action was instituted for any improper or wrongful motive. 227 Kan. at 276-78."

In contending that Shoney's and NEC maliciously defended the unemployment compensation benefits claim, Wilkinson relies on the "continuation or procurement of civil proceedings against another" wording of Restatement (Second) of Torts § 674 (1976), which states:

"One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if

"(a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and

"(b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought."

Although malicious prosecution can sometimes be based on administrative proceedings, such cases have generally involved actions against a party who later brings the claim because of an action to revoke a license or the filing of a disciplinary complaint with a state board. See Restatement (Second) of Torts § 680 (1976); 7 Am. Jur. Proof of Facts 2d 181, § 7 (1975); *Lindenman v. Umscheid*, 255 Kan. 610, 633, 875 P.2d 964 (1994) (KDHE began proceeding to revoke day care center's license).

Wilkinson does not dispute that neither Shoney's nor NEC initiated the unemployment compensation proceedings, but he strongly contends that the proceedings were "continued or procured" by their actions.

Shoney's and NEC assert that Kansas and the vast majority of other states do not recognize a cause of action for "malicious defense" or "malicious appeal" and that in Kansas we have specifically in the past refused to do so. This is a question of law over which this court exercises unlimited review.

No Kansas court has ever held that a malicious prosecution action lies against a party who defends against or appeals a claim initiated by a plaintiff and, in fact, early Kansas precedent is against this cause of action. In *Baxter v. Brown*, 83 Kan. 302, 305, 111 Pac 430 (1910), the plaintiff-appellant, sued for malicious defense of

an action, alleging that Brown, one of the defendants in the plaintiff's action to recover on a note, had filed an untrue verified answer to the plaintiff's petition, "maliciously and without probable cause, with the intent and purpose . . . to put the plaintiff to unnecessary cost and expense in maintaining his cause of action against him." 83 Kan. at 303. The second suit was dismissed for failure to state a cause of action, and on appeal, our court noted that we have recognized causes of action for malicious prosecution of a civil action but that "[w]e have failed, however, to find any authority for assessing damages for a malicious defense of an action." 83 Kan. at 305.

The *Baxter* syllabus states:

"In a civil action in which the defendant answers by a general denial and verifies his answer, but asks no affirmative relief, and judgment is finally rendered against him in the action, he is not responsible in another action for damages for expenses incurred in obtaining proof to sustain the allegations of the petition, although the defendant knew at the time he answered that the allegations were true, and that his verified denial would involve the plaintiff in considerable expense to establish the truth thereof."

The precise holding of *Baxter* must be read in light of the procedural rules under which civil litigation now operates in the State of Kansas. For example, parties against whom claims are made are now obligated to make admissions if requested under K.S.A. 60-236 and be subject to court-ordered sanctions as allowed by K.S.A. 60-237 if unnecessary proof is required. Shoney's and NEC further point out that under existing Kansas statutes, an employer has the absolute right to contest an unemployment compensation claim that the employer has reason to believe is without merit. K.S.A. 44-709. These statutory provisions impose a monetary penalty or imprisonment on parties who submit a false statement or representation knowing it to be false. K.S.A. 44-719(b). As such, Shoney's and NEC convincingly argue there is no public policy justification to create a cause of action for malicious defense against an employer for defending an unemployment compensation claim when adequate statutory remedies are available.

Although not exactly on point, the requirement that the party must have been the moving force behind the wrongful procedure

was clearly recognized in *Hokanson v. Lichtor*, 5 Kan. App. 2d 802, 809, 626 P.2d 214 (1981). In that case, Hokanson sued Faulkner for personal injury after an accident. Faulkner's insurer employed Lichtor to testify as an expert on Faulkner's behalf. Hokanson later brought an action against Lichtor, Faulkner's attorney, and the insurer, alleging they had conspired to present Lichtor's allegedly perjured testimony and seeking actual and punitive damages.

Hokanson appealed from the trial court's dismissal. The Court of Appeals considered Hokanson's argument that he had pled a valid cause of action either for wrongful use of civil proceedings or abuse of process, but found neither claim to exist.

With regard to the wrongful use of civil proceedings, the Court of Appeals' opinion looked to the elements of *Nelson v. Miller*, 227 Kan. 271, in holding that malicious prosecution required the culpable party to have been the moving force behind the wrongful civil proceeding. The opinion stated:

" 'To recover for use of wrongful civil proceedings, the present plaintiff must show that the present defendant, who was the plaintiff in the alleged wrongful civil proceedings, initiated or continued the proceedings, both without having probable cause for bringing it and primarily for a purpose other than that of obtaining the proper adjudication of the claim on which the civil proceedings were brought. The meaning of probable cause is treated in § 675. The propriety of the purpose for which an action is brought is treated in § 676. (§ 674, Comment i).'

"This clearly does not apply here where plaintiff himself brought the first lawsuit." 5 Kan. App. 2d at 809.

Wilkinson, in relying on the Restatement (Second) of Torts § 674, comment c (1976), states that even if the proceeding was properly brought in the first instance, one who either continues or takes an active part in continuing a civil proceeding for an improper purpose after learning there is no probable cause for the defense "becomes liable [for wrongful use of civil proceedings] as if he had then initiated the proceeding." None of the examples in the comments to § 674 involve liability attaching to one who defends in an action without asserting a counterclaim or cross-claim.

Some authorities have recognized an action for malicious prosecution based on the filing of a cross-complaint or counterclaim by defendant on the theory that such cross-pleadings institute a sep-

arate and independent cause of action and potentially subject the cross-defendant to the same potential liability and injury as any other claim brought in the first instance. See 7 Am. Jur. Proof of Facts 2d § 6 (1975). Most courts, however, have found that a purely defensive action provides an insufficient basis for liability. See Annot., 65 A.L.R.3d 906.

One of the few cases in the country permitting a malicious defense cause of action is *Aranson v. Schroeder*, 140 N.H. 359, 365-67, 671 A.2d 1023 (1995), which adopted the tort on the basis that the injury and expense of litigating a matter is the same whether it has its origin in a claim or defense of a claim. The dissenting opinion specifically cited the Kansas case of *Baxter v. Brown*, 83 Kan. 302, for rejecting a proposed malicious defense action. The dissent also cited cases from California, Illinois, and Indiana, where the tort of malicious defense had been rejected. 140 N.H. at 374-75.

Additionally, arguments on the issue may be found in Van Patton & Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation*, 35 Hastings L.J. 891 (1984) (generally advocating recognition of such a tort on similar grounds as *Aranson*). Arguments to the contrary are set forth in Craig, *Malicious Defense*, 13 No. 16 Mealey's Litig. Rep. Bad Faith 25 (Dec. 21, 1999) (suggesting Rule 11 sanctions are adequate to prevent improper defensive actions, that defenses must be imposed before complete investigation and discovery is made, and that to recognize such a tort would foster additional litigation with the hidden costs of such a tort to be immeasurable).

Although the exact issue of malicious defense based upon an employer's challenge of a claim for unemployment compensation benefits has never previously been addressed in Kansas, in *Char v. Matson Terminals, Inc.*, 817 F. Supp. 850 (D. Hawaii 1992), the federal district court granted summary judgment in favor of the defendant on plaintiff's malicious prosecution claim arising out of an unemployment compensation proceeding. The *Char* court found there *was* probable cause for the employer to challenge the award of unemployment benefits but went on to state:

"Moreover, even if there was not probable cause for the appeal, Matson would not be liable for malicious prosecution. The tort of malicious prosecution will lie only when the defendant initiates the proceedings. See Prosser & Keaton on Torts § 120 at 893 [5th ed.]. Here, plaintiff, not Matson, initiated the Unemployment Division proceedings." 817 F.Supp. at 859.

We are not prepared to adopt or recognize a new cause of action for malicious defense. If such is deemed desirable or needed, action by the legislature is required. This is especially true in light of our long-standing recognition of the law to the contrary.

The first element of the cause of action for malicious prosecution requiring that the defendant initiated, continued, or procured the civil procedure against the plaintiff was not met in this instance. The trial court erroneously denied Shoney's and NEC's motions for summary judgment and later erroneously denied their motion for directed verdict. The judgments for malicious defense granted by the trial court against both Shoney's and NEC are reversed.

The resolution of this issue in favor of Shoney's and NEC requires that the award of punitive damages likewise be reversed. We have held in numerous cases that a verdict for actual damages is essential to the recovery for punitive damages. Cases setting forth this rule include *Stevens v. Jayhawk Realty Co.*, 236 Kan. 90, 91, 689 P.2d 786 (1984); *Lindquist v. Ayerst Laboratories, Inc.* 227 Kan. 308, Syl. ¶ 4, 607 P.2d 1339 (1980), and date back to *Stoner v. Wilson*, 140 Kan. 383, 394, 36 P.2d 999 (1934), where our court stated: "It requires no citation of authority that before exemplary or punitive damages may be awarded there must be actual damages and a right of recovery therefore established."

There is an exception to this rule set forth in *Capitol Fed'l Savings & Loan Ass'n v. Hohman*, 235 Kan. 815, 682 P.2d 1309 (1984), which is, however, totally inapplicable to the facts before us.

The award of punitive damages against Shoney's is reversed.

Our refusal to adopt the cause of action for malicious defense and the reversal of the derivative punitive damages award negates the necessity to reach and consider the numerous additional arguments raised by Shoney's and NEC as to those two issues. The reversal of the judgment for malicious defense against NEC ren-

ders moot NEC's argument that Wilkinson's counsel should have been disqualified for a claimed conflict of interest.

With NEC's involvement in this appeal disposed of, we turn to Wilkinson's implied contract/wrongful discharge and negligent misrepresentation claims against Shoney's. Shoney's argues and Wilkinson does not contest that Missouri does not recognize wrongful discharge employment claims based on implied contracts (except under certain narrow public policy exceptions not present here). See *Luethans v. Washington University*, 894 S.W.2d 169, 172 (Mo. 1995).

Because Wilkinson may make broader claims if his employment with Shoney's was entered into in Kansas, it is critical for us to next consider the state law applicable to his claim of breach of implied employment contract.

*Was the contract of employment between Wilkinson and Shoney's entered into in Kansas or Missouri?*

It is Shoney's basic contention that if any implied contract existed at all it would of necessity be governed by the laws of Missouri because Wilkinson agreed to go back to work for Shoney's in a telephone call from his home in Missouri.

Wilkinson argues that a contract of employment is "made" when the last act necessary to complete the contract occurs and, in this instance, that was when he met with Mike Tucker at the Kansas City, Kansas, State Avenue store to agree on the position, salary, and schedule of work.

The parties point to cases involving insurance contracts, with Shoney's citing *Simms v. Metropolitan Life Ins. Co.* 9 Kan. App. 2d 640, Syl. ¶ 1, 685 P.2d 321 (1984), for the holding that "[u]nder Kansas law, the choice of which state's law is applicable to the construction of a contract depends on where the contract is made." Wilkinson's argument is not materially different in relying on *State Farm Mut. Auto. Ins. Co. v. Baker*, 14 Kan. App. 2d 641, Syl. ¶ 2, 797 P.2d 168, *rev. denied* 247 Kan. 705 (1990), which relies on *Simms* and further states: "For choice of law purposes, a contract is made where the last act necessary to complete the contract occurs."

Most cases which focus on the precise issue of where a contract of employment is made involve workers compensation claims. In *Smith v. McBride & Dehmer Construction Co.*, 216 Kan. 76, 79, 530 P.2d 1222 (1975), the earlier cases were summarized by Justice, later Chief Justice Prager in this manner:

"This court has dealt with the question of where a contract of employment is made on several occasions. (*Davis v. Jacob Dold Packing Co.*, 140 Kan. 644, 38 P.2d 107; *Pearson v. Electric Service Co.*, 166 Kan. 300, 201 P.2d 643; *Hartigan v. Babcock & Wilcox Co.*, 191 Kan. 331, 380 P.2d 383; *Morrison v. Hurst Drilling Co.*, 212 Kan. 706, 512 P.2d 438.) In each of our cases we have generally relied upon the rule of the Restatement of Contracts, § 74, which states as follows:

'A contract is made at the time when the last act necessary for its formation is done, and at the place where that final act is done.'

"*Pearson, Hartigan* and *Morrison* all involved telephone conversations where an agent of the employer offered employment and the offer was immediately accepted orally by the injured employee. In each case we held that the oral acceptance of employment by the employee communicated to the employer was the last act necessary for the formation of the contract. In *Davis* the offer of employment was made by a letter directed to the claimant. This court held that it was indispensable to the formation of a contract for employment that the claimant manifest an acceptance of the offer. . . . In *Davis* this court found that the claimant manifested acceptance by going to New Mexico and in no other way. Presence at the place of work was the last act done necessary for formation of a contract of employment." 216 Kan. at 79.

The facts in *Smith* showed that a construction foreman on an Oklahoma job told a laborer, Bowie, to notify Smith that if he wanted to go to work to show up at the job site. Bowie talked to Smith about the job, and Smith went to the job site where he was hired and put to work. We held: "The last act done necessary to consummate a contract of employment was Smith's reporting at the job site in Oklahoma and at that point a contract of employment was formed." 216 Kan. at 80. There was substantial competent evidence to support the trial court's finding that the contract of employment was made in Oklahoma and not in Kansas.

Helpful to Shoney's position is *Neumer v. Yellow Freight System, Inc.*, 220 Kan. 607, 556 P.2d 202 (1976). In *Neumer*, the claimant, a resident of Kansas, was in Kansas when he received a telephone call from a hiring agent for Yellow Freight who was in Missouri.

The agent said, " 'Be at work at 12:01 Monday morning at [the terminal in Kansas City, Missouri].' " 220 Kan. at 608.

The court found this constituted an acceptance of Neumer's prior offer in Missouri so the offer and acceptance were both made in Missouri. On appeal, our court held the trial court's ruling that the contract of employment was made in Missouri was supported by substantial competent evidence.

With the foregoing principles in mind, we return to and of necessity repeat the evidence and testimony in the record concerning Wilkinson's reemployment by Shoney's.

Regional/division director White approached Wilkinson in Missouri and told him Shoney's was going to have some positions opening up, and Wilkinson should consider coming back to work for them. Wilkinson said he would think about it, and he gave White his Missouri home phone number.

Several days later, White, while in the State Avenue store in Kansas, called Wilkinson and said he had a position available. Wilkinson was unsure and wanted to talk with his wife. After he did so, he called White and said he would come back but he had to give Bennigan's 2 weeks' notice. White told him he would have to obtain the approval of the Rehire Board the following Monday in Raytown, Missouri.

Wilkinson went before the Rehire Board and was called that night at work by White to tell him he had been cleared by the board. White told Wilkinson to call Tucker, the manager of the State Avenue store in Kansas City, Kansas, about the start date and salary and to see if they "could get together" and "if [they] wanted to work together." Wilkinson said he and Tucker still had to decide if they wanted to work together.

Wilkinson testified he went to see Tucker at the State Avenue store 2 days later. They discussed salary and agreed Wilkinson would start a couple of days later as a cook and that when Wilkinson was finished at Bennigan's, Tucker would make Wilkinson the kitchen manager at the State Avenue store.

White testified that as soon as the board approves a rehire, the person is free to begin work as soon as a position opens. He did not view himself as having performed the rehiring of Wilkinson;

he viewed that as occurring more with the area supervisor and others who set Wilkinson up with a position.

Tucker testified that before the board approved Wilkinson, they called him and asked if he had a slot for Wilkinson and would be interested in him. Tucker was looking for a good kitchen manager and said he would be interested in Wilkinson. Tucker said that after Wilkinson was cleared by the board, area supervisor Nikzad called Tucker and said Wilkinson was "back on board" with Shoney's and that they wanted to place him in Tucker's store. Tucker testified, "We negotiated a salary for him, and at that point—which, I believe, the salary negotiation had already taken place. We agreed on the figure. He started to work for me on a Wednesday."

Wilkinson argues that the contract was formed in Kansas at the State Avenue store either when Wilkinson and Tucker agreed on the position and related details or when Wilkinson showed up for his first day of work there. Shoney's argues that if any implied contract existed, it came into being in Missouri either when Wilkinson agreed to go back to Shoney's during a telephone call while Wilkinson was at home in Missouri or when Wilkinson cleared the Rehire Board in Missouri.

When the parties were arguing the issue to the trial court, the decision was reached in this manner:

"THE COURT: Well, let's ask Mr. Wilkinson. Sir, how did you know what store you were going to go to?

"MR. WILKINSON: Robert called me and asked me to go out and talk to Michael and see if we can get together and if we wanted to work together and I came out to State Avenue and talked to him, discuss the salary and then —

"THE COURT: So it was [the] two of you that had to decide you liked each other to work with each other?

"MR. WILKINSON: Yes. Yes, ma'am."

"THE COURT: Okay. I'm going to say Kansas law applies."

Although the parties had substantial negotiations in Missouri, the terms of employment were still indefinite as to salary, position, and schedule, and the issue of whether Tucker and Wilkinson wanted to work with each other was unsettled until the meetings and commencement of employment at the State Avenue store in Kansas City, Kansas. See 1 Corbin on Contracts § 2.8, p. 131 (re-

vised ed. 1993) (mutual expressions of agreement may fail to consummate a contract for the reason that they are not complete, due to some essential term or terms not being agreed upon); 1 Corbin on Contracts § 4.1, p. 524 (describing concept of indefiniteness of terms).

We hold there was substantial competent evidence to support the trial court's decision that the employment agreement was made in Kansas.

We also note that in his application for unemployment benefits, Wilkinson designated Kansas as the state liable for his claim. Although Shoney's, through NEC, contested the allowance of benefits before the Kansas Department of Human Resources, it does not appear to ever have contended that the employment contract was entered into in Missouri. This, however, is not the basis for our decision, as there is a substantial legal basis for the trial court's ruling irrespective of these facts.

Having decided that Kansas law applies, we next look to the joint issues of whether the implied contract/wrongful discharge and negligent misrepresentation claims were properly submitted to the jury.

*Did the trial court err in denying Shoney's motion for summary judgment, directed verdict, or judgment as a matter of law on Wilkinson's breach of implied contract/wrongful discharge claims to the jury?*

Our scope of review of the arguments Shoney's raises has been previously set forth.

Shoney's principally argues that (a) there are multiple contract disclaimers which defeat any claim of existence of an implied contract, and the language relied upon is too general to constitute such a contract, and (b) if, in fact, an implied contract existed, Wilkinson's firing was consistent with progressive discipline.

Wilkinson contends the implied contract/wrongful termination claims were properly submitted to a jury because there was a dispute as to the terms of the parties' agreement and that the disclaimers did not preclude his claims for relief.

It is not necessary for us to develop the historical background of our employment law in Kansas, which was well accomplished by Justice Prager in our landmark case *Morriss v. Coleman Co.*, 241 Kan. 501, Syl. ¶ 1, 738 P.2d 841 (1987). *Morriss* sets forth the matters which we should consider:

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

With this direction we look further into the evidence presented, which relates to the terms of employment, rights under the rehire policy, Shoney's fair treatment guarantee, the framework for progressive discipline, Shoney's Owner and Operator Guide to Employees Relations and the Law, the Employee Handbook, and the Welcome to Shoney's poster that repeated much of the information contained in the other items.

Wilkinson presented evidence of Shoney's written policies of fair treatment, progressive discipline, firing for cause, and of not holding past employment problems against a rehired employee once the employee passed the Rehire Board. For example, the rehire policy stated that if one received an affirmative vote from the Rehire Board, "you will be eligible to go back to work with no hard feelings from anyone."

Shoney's policies in dealing with the use of a slur or gesture that is sexist contained step discipline that was stated to be progressive for each offense, with the fourth offense resulting in termination. The fair treatment guarantee stated that employees be treated "with respect and in a fair and just manner at all times."

Wilkinson presented evidence that new employees were customarily introduced to these policies upon being hired and were encouraged to read and re-read them in order to familiarize themselves with the policies. He testified that as a manager for Shoney's in various capacities over the years, he was asked by Shoney's to

enforce its policies and was trained as a manager to make sure there is reason to terminate someone. Wilkinson presented evidence that members of Shoney's management at various levels believed that the policies stated in the poster and manual accurately represented Shoney's policy and that employees had a right to believe those policies. This was bolstered by testimony of Ball, Marstellar, Nikzad, Tucker, and former area director Snider. Wilkinson said he relied on his understanding of these policies as learned over the years as a manager of Shoney's and as stated in the poster and manual that he was shown upon his rehire. He believed he was entitled to fair treatment, to the application of progressive discipline, and to expect that Shoney's would honor its statement that there would be "no hard feelings" against rehired employees for past conduct during previous employments.

Shoney's makes an unpersuasive argument that the exhibits and testimony concerning Shoney's terms of employment raised no factual issues for the jury to consider. Shoney's relies on the disclaimers in the poster and its manuals which state the policies were not intended to form contractual commitments or guarantees and were subject to change. The precise language is set forth on the "Welcome to Shoney's Inc." poster as follows:

"**Employment Guidelines.** Except for obligations imposed by state or federal statutes or by court order, the contents of this poster are only general guidelines for employment practices. The procedures, practices, and policies set forth are not intended to be and shall not be considered contractual commitments or guarantees. Any procedure, practice or policy outlined in this poster may be changed, suspended, or deleted, with or without further notice. Notwithstanding these practices or procedures, any employee or the company can, at any time, for any or no reason, with or without notice, terminate the employment relationship."

Shoney's also refers to a disclaimer in a 1986 employment application filled out by Wilkinson, but the undisputed evidence was that he did not fill out an application when he was rehired in 1993 and had no idea if any such disclaimer applied to his reemployment in 1993.

While there was evidence Wilkinson had read the disclaimer on the poster, he said he did not understand it, and there was no evidence that this disclaimer or any other disclaimer was specifi-

cally drawn to his attention by Shoney's prior to or during his employment. Furthermore, it was not established at trial that the disclaimer was intended to create an unqualified employment-at-will relationship in light of the other contradictory provisions in Shoney's written materials, the attitudes of various Shoney's managers, and the Shoney's practice during new employee orientation and during manager training of encouraging employees and managers to follow and rely on the policies stated in these materials.

A similar disclaimer was at issue in *Morriss v. Coleman Co.*, where we stated:

"The disclaimer in the supervisor's manual quoted above does not as a matter of law determine the issue. It has not been established that the disclaimer was brought to the personal attention of its employees or that it was intended by Coleman to create an unqualified employment-at-will relationship, especially in view of other provisions in the manual and the statements made by Coleman's supervisors to the employees." 241 Kan. at 514.

Our court in *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 132-40, 815 P.2d 72 (1991), utilized the above quote and the wording of *Morriss* that followed in stating that a disclaimer is not determinative in Kansas as a matter of law but is only evidence to be considered; "[t]he ultimate decision of whether there was an implied contract not to terminate the plaintiffs without just cause must be determined from all the evidence presented by the parties on that issue." 241 Kan. at 514.

The disclaimer language is *not* determinative and is only a factor to be considered by a properly instructed jury.

The evidence was sufficient under the principles expressed in *Morris* and subsequent precedent to withstand the motions for summary judgment and directed verdict/judgment as a matter of law and to be submitted to the jury for determination. See *Brown v. United Methodist Homes for the Aged*, 249 Kan. at 132-40; *Morriss*, 241 Kan. at 513-14; *Masterson v. Boliden-Allis, Inc.*, 19 Kan. App. 2d 23, 24-26, 865 P.2d 1031 (1993) (relying on *Morriss* and *Brown* and holding the fact a widely distributed personnel manual describing the company's progressive disciplinary and discharge procedures, although not received by plaintiff, did not preclude

him from using the manual as evidence of the defendant's actual discipline and discharge policy).

Shoney's argues that even if there was an implied contract, there was insufficient evidence that Shoney's breached that contract. Shoney's asserts that it followed the spirit and letter of its progressive discipline guidelines. Specifically, Shoney's argues that the usual disciplinary steps of verbal warning, written warning, and suspension prior to resorting to termination do not apply when an allegation of sexual harassment results in an internal investigation.

However, Wilkinson was not actually fired for such an offense. Marstellar fired him because a proper reference check had not been conducted by the Rehire Board and because Marstellar thought Wilkinson should not have been rehired. He did not fire Wilkinson based on DeLapp's allegation. A reasonable jury could conclude that Shoney's reason and procedure for terminating Wilkinson violated Shoney's policy of progressive discipline as well as Shoney's rehire policy, which expressly states that if an employee goes before the Rehire Board and explains his or her side of the story regarding the employee's previous employment situation and is thereafter approved by the Board, the employee could be rehired "with no hard feelings from anyone."

Finally, Shoney's argument that the statements relied upon by Wilkinson were too vague to constitute an employment contract is simply without merit. There were many specific provisions in the various employee materials upon which the jury could rely to find the existence of an implied employment agreement.

We hold the issues of breach of an implied employment contract and/or wrongful discharge properly survived motions for summary judgment and motions for directed verdict and were properly submitted to the jury for its determination.

We next turn to the question of whether Wilkinson's claim of negligent misrepresentation was properly submitted to the jury.

*Did the trial court properly submit Wilkinson's claim of negligent misrepresentation to the jury for determination?*

Shoney's challenged Wilkinson's claim of negligent misrepresentation in its motions for summary judgment and directed verdict.

Shoney's asserts that the trial court erred in submitting this claim to the jury because the alleged misrepresentations were all statements about how Shoney's would treat Wilkinson in the future rather than false statements of present fact. Whether the alleged misrepresentations were ones of present fact or ones of opinion or future intent is a question of law. *Bittel v. Farm Credit Svcs. of Central Kansas*, P.C.A., 265 Kan. 651, 665, 962 P.2d 491 (1998).

In *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604-05, 876 P.2d 609 (1994), this court adopted the tort of negligent misrepresentation, as defined in Restatement (Second) of Torts § 552 (1976). Section 552 was quoted in *Mahler* as follows:

" '(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

" '(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

'(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

'(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

" '(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.' " 255 Kan. at 604.

*Mahler* involved a claim against a real estate agent in connection with false statements made by the agent to buyers as to water and sewage problems on the property the buyers were considering purchasing. We explained the difference between the torts of negligent misrepresentation and fraudulent misrepresentation by saying that " 'while the latter requires proof that the defendant knew the statement was untrue or was reckless as to whether the statement was true or false, the former merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information.' " 255 Kan. at 604.

As explained in *Gerhardt v. Harris*, 261 Kan. 1007, 1018, 934 P.2d 976 (1997):

"The comments to § 552 show that negligent misrepresentation applies to suppliers of commercial information in favor of users of such information in their commercial transactions. Restatement (Second) of Torts § 552, comment a. The comments include such examples as negligent audits furnished to relying parties in a financial transaction, negligent engineer reports relied on by contractors bidding for construction work, and negligent land surveys relied on by parties to real estate contracts. Restatement (Second) of Torts § 552, comments e and h."

"The tort of negligent misrepresentation as set forth in Restatement (Second) of Torts § 552 (1976) does not, by its terms, apply to misrepresentation of an intention to perform an agreement. The tort only applies to cases of misrepresentation of factual, commercial information, not to statements of future intent." 265 Kan. 651, Syl. ¶ 7.

In *Gerhardt*, 261 Kan. 1007, Gerhardt sued her former attorney on various theories, including fraud and negligent misrepresentation, after the attorney refused to honor a decision by a county fee dispute committee. Gerhardt had agreed to allow certain insurance proceeds to be placed in the attorney's trust account in reliance on her belief that he had agreed to be bound by the committee's decision in their dispute. The attorney asserted that he never agreed to abide by the committee's decision and never intended to be bound by it. This court affirmed the grant of summary judgment in favor of the defendant attorney on the negligent misrepresentation claim. 261 Kan. at 1018.

In analyzing Gerhardt's claim, the court discussed and quoted from *Eckholt v. American Business Information, Inc.*, 873 F.Supp. 521 (D. Kan. 1994), and *City of Warrensburg, Mo. v. RCA Corp.*, 571 F. Supp. 743 (W.D. Mo. 1983). *Eckholt* involved a plaintiff employee who, following his termination, made claims for both fraudulent and negligent misrepresentation against the employer and parent corporation based on representations made in an employment agreement. In his claim for negligent misrepresentation, Eckholt asserted the defendants were negligent in representing their then-current intent to employ him pursuant to the terms of the employment agreements. Although Eckholt's fraud claim sur-

vived summary judgment, the court found no merit in the claim of negligent misrepresentation, stating that the record contained no evidence of negligence and that the defendants either intended to carry out their promises or they did not. " 'To recognize a claim for negligent promise, on this record, would be to endow every breach of contract with a potential tort claim for negligent promise.' " 261 Kan. at 1020-21 (quoting *Eckholt*, 873 F. Supp. at 532).

In *City of Warrensburg*, 571 F. Supp. 743, the City alleged that the defendant company broke its promises to locate a manufacturing plant in Warrensburg's industrial park, causing an urban development grant to be lost. The Missouri court distinguished negligent misrepresentation under § 552 from misrepresentation of intention to perform an agreement under Restatement of Torts (Second) § 530 (1976), quoting the comment to § 530, which stated in part: " 'If the agreement is not enforceable as a contract, as when it is without consideration, the recipient still has, as his only remedy, the action in deceit under the rule stated in § 525 [Liability for Fraudulent Misrepresentation].' " 571 F. Supp. at 753. In Gerhardt, this court quoted the following passage from *City of Warrensburg*:

" 'Unlike § 530, § 552 does not, by its terms, apply to misrepresentation of intention to perform an agreement. Nor do the illustrations to § 552 apply to other than typical cases of misrepresentation of factual, commercial information. The Comments to § 530 specifically state that where there is no viable action on the contract, the exclusive remedy for misrepresentation of intention to perform an agreement lies in the action for deceit. . . . A merely negligent misrepresentation of a maker's own intention is not actionable under § 530 for the reason that in the absence of any fraudulent intent . . . there is no misrepresentation of any existing fact on which any action for negligent misrepresentation could be based.' 571 F.Supp. at 753." 261 Kan. at 1021-22.

The above reasoning of *City of Warrensburg* was applied by this court in rejecting Gerhardt's negligent misrepresentation claim. 261 Kan. at 1021-22.

This same reasoning is applicable in the present case. Wilkinson claims he was induced to leave his job at Bennigan's to work for Shoney's in reliance on Shoney's written policies and in reliance

on regional/division director White's statement that Shoney's had changed and now treated its people well.

The statement by White that Shoney's treated its employees well was too vague a statement on which to base a claim of negligent misrepresentation in this case; it was closer to a personal opinion than a representation of past or present fact. See *Darst v. Illinois Farmers Ins. Co.*, 716 N.E.2d 579, 584 n.6 (Ind. App. 1999) (distinguishing factual statements from statements of mere opinion on which a person cannot reasonably rely); Comments b and e of Restatement (Second) of Torts § 552 (1976) (describing commercial or professional opinions given or based upon facts supplied by or otherwise known by the recipient and on which liability may be based); *cf. Timi v. Prescott State Bank*, 220 Kan. 377, 389, 553 P.2d 315 (1976) (in context of fraudulent misrepresentation, distinguishing statements of fact from statements which are either vague or indefinite or which are statements of mere opinion).

Additionally, the information that Wilkinson relies on for a claim of negligent misrepresentation needs to be factual and directed to him as a prospective employee rather than as an already-hired employee. The information in the poster and manuals do not meet this requirement since he had already been rehired and was again an employee when he viewed this information.

In fact, contrary to Wilkinson's arguments, all of his claimed "misrepresentations" do relate to future events which Shoney's may well have intended to apply in the manner their policies, manuals, or poster directed. Although this case is certainly factually different, we held specifically in *Bittel* that "[t]he tort of negligent misrepresentation as set forth in Restatement (Second) of Torts § 552 (1976) does not, by its terms, apply to misrepresentation of an intention to perform an agreement. The tort only applies to cases of misrepresentation of factual, commercial information, not to statements of future intent." 265 Kan. 651, Syl. ¶ 7.

The central issue in *Bittel* was the application of K.S.A. 16-118 relating to credit agreements. But, in reference to statements as to whether the PCA would continue to finance Bittel's farm operations, we stated that they pertained to an intent to perform in the future. As such, they were "not the type of misrepresentation con-

templated by § 552 of the Restatement and are not recoverable under a negligent misrepresentation theory." 265 Kan. at 665.

The *Eckholt* opinion in discussing this type of claim referred to it as being one of "negligent promise" and that the employees either intended to carry out their promises or did not. The court went on to state: "To recognize a claim for negligent promise, on this record, would be to endow every breach of contract with a potential tort claim for negligent promise." *Eckholt*, 873 F. Supp. at 532.

We hold that a submissible claim of negligent misrepresentation has not been made under the facts of this case, and the trial court erred in not granting Shoney's summary judgment motion or motion for directed verdict on this claim.

We must next consider whether reversible error was caused by the combining of the breach of contract claim with the negligent misrepresentation claim on the same verdict form.

*Is Shoney's entitled to a new trial given that it suggested that both the breach of implied contract claim and the negligent misrepresentation claim should be combined on a single verdict form?*

Shoney's contends the trial court's verdict form which combined the claims of negligent misrepresentation and breach of implied contract created reversible error. It appears from the record that both parties submitted separate verdict forms on the claims of violation of the breach of implied contract claims against Shoney's and the claim of negligent misrepresentation against Shoney's.

However, the record does not reveal a clearly stated objection to the verdict form finally given by the court. Therefore, the clearly erroneous standard of review would normally apply on this issue. See *Fudge v. City of Kansas City*, 239 Kan. 369, 378, 720 P.2d 1093 (1986); *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984).

The actual verdict form that was submitted, without objection, to the jury read as follows:

## "VERDICT FORM - WRONGFUL DISCHARGE AND NEGLIGENT MISREPRESENTATION

"On plaintiff Raymond Wilkinson's wrongful discharge and negligent misrepresentation claims against defendant Shoney's, Inc., we find in favor of:

"_____ Plaintiff Raymond Wilkinson
"_____ Defendant Shoney's Inc."

The jury marked an X in the line showing a finding in favor of Wilkinson and went on to fill in the rest of the verdict form finding damages for lost earnings and benefits of $53,982, future lost earnings and benefits of $96,749, and $7,540 in lost medical expenses.

Shoney's asserts the form was clearly erroneous because the jury may have found for Wilkinson only on the negligent misrepresentation claim and may have awarded some or maybe all of the damages on that basis. It relies on *Munsell v. Ideal Food Stores*, 208 Kan. 909, Syl. ¶ 7, 494 P.2d 1063 (1972) ("trial court erred in submitting only one general verdict to the jury allowing it to return one verdict determining damages in a lump sum under all four counts of plaintiff's petition.").

This verdict form appears at least in part to have been the result of Shoney's arguments to the trial court that under *Mahler,* the damages on a negligent misrepresentation claim are limited to the pecuniary loss caused by the misrepresentation. During this discussion in the trial court, the suggestion was made that a claim of pain and suffering should not to be submitted for the negligent misrepresentation claim:

"THE COURT: 9.01 would not be necessary at all. I could put negligent misrepresentation in with the —
"MR. BOATRIGHT: [Shoney's counsel] The contract.
"THE COURT: The 14.22 you — you understand what he's saying?"
"MR. NICESWANGER: [Wilkinson's counsel] I do, Your Honor."

The court and parties discussed the risks to the parties and the difficulties that might result on appeal. But, the instructions on the elements of the claims were separately given, and the verdict form that was utilized apparently met with the approval of both parties. More importantly, it was not objected to by Shoney's and, as we have stated above, appears at least in part to have arisen out of the

desire of Shoney's to limit the damages that might have been separately assessed if separate verdict forms were utilized.

Shoney's actions are not precisely invited error (see *Hawkinson v. Bennett*, 265 Kan. 564, 585, 962 P.2d 445 [1998]), but the manner in which the verdict form was formulated by the court appears to have its roots in the discussion previously described.

It should also be noted that the two different claims are conjunctively joined by "and," which allows an equally plausible argument that both claims were found by the jury to exist.

In the absence of a properly preserved objection by Shoney's, we are not prepared to hold that it may now obtain a new trial on an issue to which their own actions and contentions contributed. The verdict form is not clearly erroneous.

*Did the trial court abuse its discretion by not allowing Shoney's to present after-acquired evidence of sexual harassment?*

In late 1994, a former Shoney's waitress, Shelly Nelson, filed an EEOC complaint claiming that Wilkinson sexually harassed her at work in 1987. It is Shoney's theory that Wilkinson would have been fired in 1994 based on Nelson's allegations, thereby diminishing his claim for lost earnings.

Shoney's claims the trial court erred in refusing to allow it to present this after-acquired evidence in the form of the complaint and testimony of Juanita Presley that if Wilkinson had still been employed at Shoney's at the time of the complaint, she would have recommended terminating his employment. A proffer of Presley's testimony and a copy of the complaint was made.

Presley was not the one who investigated the Nelson complaint for Shoney's. The trial court found that Shoney's had not laid a proper foundation for her to give a termination recommendation based only on the complaint. The court also noted that Shoney's failed to subpoena or take the deposition of Nelson to offer some substantiation of the complaint and that the jury would not have the opportunity to evaluate Nelson's credibility in order to weigh whether the company would rationally have fired Wilkinson based on her complaint. The court found the allegations were not substantial, and it had the right to exclude the evidence as being too

prejudicial. See K.S.A. 60-445; *State v. Knighten*, 260 Kan. 47, 53, 917 P.2d 1324 (1996). We hold the trial court did not abuse its discretion in refusing to admit this evidence in the manner it was presented.

Neither was this evidence required to be admitted under the principles of *Gassman v. Evangelical Lutheran Good Samaritan Society, Inc.*, 261 Kan. 725, 728-29, 933 P.2d 743 (1997). The fact an employee *was guilty* of misconduct is one part of the three-prong test of *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995), and it is also required that the misconduct *would* have justified discharge and the employer *would* have discharged the plaintiff had the employer known of the misconduct. These requirements were not satisfied here.

*Did the trial court abuse its discretion in refusing to allow Shoney's employee Hughes to testify?*

The standard of review for a trial court's ruling regarding the admission of evidence is whether the trial court abused its discretion. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 1, 976 P.2d 486 (1999).

Wilkinson asserts that Lawrence Hughes, Shoney's corporate representative, was not identified as a witness until just before trial even though the pretrial order seems to have required witnesses to be identified almost a year earlier, before the end of 1995. Shoney's made various arguments that it wanted Hughes as a fact witness on Shoney's employment policies, rehire policy, and retention of store managers, and to minimize Wilkinson's claimed damages.

Wilkinson objected to Hughes testifying based on failure to timely designate him as a witness, the lack of opportunity to depose him, and his lack of knowledge of Wilkinson's employment progress because he had never been his supervisor. Wilkinson argues further that while a proffer was made it was not a sufficient one.

These were all issues for the trial judge to weigh and resolve. The trial court sustained the objection to Hughes' testimony, citing failure to designate, prejudice, the fact it was the last day of trial, as well as lack of relevancy. Shoney's has failed to show an abuse of discretion in this matter.

## WILKINSON'S CROSS-APPEAL

*Did the trial court err in granting summary judgment on Wilkinson's defamation claims?*

Wilkinson's defamation claims were based on statements made during the unemployment compensation proceedings, as well as other statements made to and by Shoney's employees.

Wilkinson asserts the trial court erred in granting summary judgment on his claims of defamation against NEC and Shoney's. We do not agree.

Any of the statements made in connection with the proceedings before the KDHR were privileged. See *Clear Water Truck Co., Inc. v. M. Bruenger & Co., Inc.*, 214 Kan. 139, 141-43, 519 P.2d 682 (1974) (communications or statements given in the course of, and relevant to, quasi-judicial administrative proceedings are absolutely privileged).

The statements made by Shoney's employees mainly concerned Wilkinson and the fact that a complaint had been made against him by DeLapp. These statements were not defamatory because DeLapp *had* complained of sexual harassment by Wilkinson. Truth is an absolute defense to an action of defamation, *Froelich v. Werbin*, 219 Kan. 461, 462, 548 P.2d 482 (1976), and the statements made were, in general, truthful.

Wilkinson also asserts a claim of self-defamation. This claim has been made for the first time on appeal and will not be considered. *Brock v. Richmond-Berea Cemetery Dist.*, 264 Kan. 613, Syl. ¶ 6, 957 P.2d 505 (1998).

The trial court correctly granted summary judgment on Wilkinson's defamation claims.

*Did the trial court err in not granting discovery sanctions against Shoney's?*

Finally, Wilkinson appeals the trial court's decision not to grant discovery sanctions against Shoney's. Our standard of review on this issue is abuse of discretion. See *Shay v. Kansas Dept. of Transportation*, 265 Kan. 191, Syl. ¶ 1, 959 P.2d 849 (1998).

This matter was hotly contested. Wilkinson filed and the trial court ruled on several motions to compel. Some motions were not

ruled on at pretrial and were left pending until after the interlocutory appeal was dismissed at which time the trial court heard arguments and denied the motion for sanctions.

The facts relevant to discovery are complex and in dispute, with each side complaining about the other's behavior. The trial court did not abuse its discretion in denying Wilkinson's motions for sanctions under the circumstances of this case.

*Summary of holding*

The State of Kansas does not recognize the tort of malicious defense, and the judgments for malicious defense against Shoney's and NEC are reversed.

The award of punitive damages against Shoney's is reversed.

There was substantial competent evidence to support the trial court's ruling that Wilkinson's contract of employment was entered into in Kansas.

Whether Shoney's breached its implied employment contract and wrongfully discharged Wilkinson was a question for the jury.

The trial court erred in submitting Wilkinson's claim of negligent misrepresentation to the jury.

The verdict form was not clearly erroneous, and the verdict of the jury on the implied contract/wrongful discharge claim is affirmed.

Shoney's has failed to show abuse of discretion regarding the exclusion of its after-acquired evidence of sexual harassment and the testimony by Hughes.

Wilkinson's claims of defamation and discovery sanctions in his cross-appeal are denied.

Affirmed in part and reversed in part.

MCFARLAND, C.J., SIX, J., and DAVIS, J., not participating.
KNUDSON, J., WAHL, S.J., and JACKSON, S.J., assigned.[1]

---

[1] **REPORTER'S NOTE:** Judge David S. Knudson, of the Kansas Court of Appeals, was appointed to hear case No. 82,611 vice Chief Justice McFarland pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c). Senior Judges Richard W. Wahl and Fred S. Jackson were appointed to hear the same case vice Justices Six and Davis pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.