## In re ROLLING THUNDER GAS GATHERING, L.L.C., Debtor.

### No. 05–10476.

United States Bankruptcy Court, D. Kansas.

Aug. 16, 2006.

Rolling Thunder Gas Gathering, L.L.C., Pawnee Rock, KS, pro se.

J. Michael Morris, Wichita, KS, for trustee.

## ORDER SUSTAINING OBJECTION OF THE OFFICIAL UNSECURED CREDITORS COMMITTEE TO CLAIM NO. 11 OF DAVID AND NANCIE PETERSON

ROBERT E. NUGENT, Chief Judge.

Before the Court is the objection of the Official Unsecured Creditors Committee (the "Committee") to claim no. 11 filed by David and Nancie Peterson (the "Petersons") in this case.[1] The Committee appears by Martin Ufford of Redmond & Nazar, L.L.P. and the chapter 11 trustee, J. Michael Morris, appears in person. The Petersons appear pro se. All other appearances are as recited in the record.

1. Dkt. 172.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B). The Court has jurisdiction over this contested matter under 28 U.S.C. § 157(b)(1) and § 1334(b).

## Procedural History

Rolling Thunder Gas Gathering, L.L.C. ("Rolling Thunder" or "Debtor") operates a natural gas pipeline in Kansas, purchasing and delivering gas. This case began as an involuntary chapter 11 filed on February 7, 2005 by three petitioning creditors. After a hearing on February 11, 2005, the Court appointed a trustee under 11 U.S.C. § 1104 and the United States Trustee designated J. Michael Morris ("Trustee") to serve in that capacity. He continues to serve. The debtor did not contest the involuntary petition and, on March 16, 2005, this Court entered an Order for Relief, adjudicating the debtor as bankrupt. On April 21, 2005, the United States Trustee appointed a creditors' committee of five pursuant to 11 U.S.C. § 1102. In due course, the Court established a bar date for claims. That date has now expired.

On April 7, 2005, the Petersons filed claim no. 11 in the amount of $728,686.50 or "50% ownership of Rolling Sky, LLC," a limited liability company owned by debtor. Their claim is based upon a promissory note from debtor dated January 1, 2004 in the forgoing amount and purports to be secured by a first mortgage with power of sale on debtor's 50 per cent ownership interest in Rolling Sky. The Committee objects to this claim on several grounds: (1) that the Petersons in fact seek a return of an equity investment, rather than payment of a claim; and (2) that the claim is based on a note given by debtor in payment of an obligation incurred by debtor's parent company, Challenger Investment,

and that debtor received no consideration for the issuance of the note.

The Petersons also filed an Omnibus Objection to the claims of all the other creditors in this case.[2] After that document drew numerous responses from creditors, the Petersons amended their objection.[3] Again, many of the affected creditors filed responses to the amended Omnibus Objection. At present, action on the Petersons' Omnibus Objection is temporarily deferred pending the Trustee's investigation of the various other creditor claims. Pursuant to an order entered herein on July 3, 2006, if the Trustee does not object to those creditor claims by November 13, 2006, the Petersons may renew their objection.[4]

On May 17, 2006, the Court convened an evidentiary hearing on the Committee's objection to the Petersons' claim. At that time, the Court admitted by stipulation a number of exhibits, including transcripts of the Petersons' Rule 2004 examinations. The Court heard a brief oral presentation from Committee counsel and the Petersons testified in support of their claim. The Committee submitted a trial brief with appendices and exhibits.[5] The Petersons declined the opportunity to respond to the trial brief. After careful review of the record, the Court is ready to rule.

## Findings of Fact

Rolling Thunder is a Kansas LLC, organized in December of 2001 to acquire and hold gas purchase contracts and operate a gas gathering system. Initially, Rolling Thunder bought gas from various producers connected to the pipeline which runs in Pawnee, Hodgeman and Ness Counties in western Kansas. Rolling Thunder is owned by Challenger Investment Company ("Challenger"), a Colorado

---

**2.** Dkt. 177.

**3.** Dkt. 200.

**4.** Dkt. 330.

**5.** Dkt. 316.

entity that also owns, in whole or in part, Thunderstruck Production Group, L.L.C., a Colorado entity ("Thunderstruck") and Superior Energy Services, L.L.C. ("Superior"). Challenger is owned or controlled by Mike and Kristina Walter. Rolling Thunder assigned its gas purchase contracts to Thunderstruck and entered into a transportation agreement with Thunderstruck in August of 2003.

The Petersons are the parents of Kristina Walter, who is married to Mike Walter. Mike Walter ("Walter") is the president of Rolling Thunder. In November, 2001, Walter approached the Petersons about investing in Rolling Thunder and Superior, two limited liability companies he was in the process of forming through Challenger. In November and December, 2001, the Petersons "invested" (the term they used throughout their depositions) $300,000 in Rolling Thunder and a $100,000 in Superior. They invested another $50,000 in Rolling Thunder in March, 2003. The Petersons made a series of payments beginning on November 21, 2001 and continuing through March 5, 2003 for a total investment of $450,000. Several of these payments were made to Challenger because Rolling Thunder and Superior had yet to be formed. After these investments, the Petersons owned a 30% interest in Rolling Thunder and a 10% interest in Superior.

Both Petersons characterized and considered these payments as investments. David Peterson testified in his 2004 examination that all of these payments were intended as investments in Rolling Thunder and Superior. He also stated that they intended to invest $350,000 in Rolling

Thunder and $100,000 in Superior. Nancie Peterson testified that the $450,000 represented the Petersons "initial investments or initial capital in Rolling Thunder and Superior Energy," and that these transfers of money were investments and not loans. Nancie Peterson testified:

> Q. And at that time-and I'm talking about the time you made these transfers totaling $450,000. Did you consider any of those transfers to be loans as opposed to investments?
>
> A. No. *They were all investments.*[6]

In the fall of 2003, Challenger agreed to sell its pipeline operations to MTI/USA. To further that agreement, the Petersons executed a Bill of Sale and Assignment of Interest dated November 25, 2003 (Bill of Sale) assigning all of their interest in Rolling Thunder back to Challenger effective as of January 1, 2003.[7] The stated purchase price for the Petersons' interest was $1,983,700.00. The Petersons claim this amount represents an agreed increase in the value of their original investment of $350,000 in Rolling Thunder. Challenger was to pay the Petersons for their interest by wire transfer "at a mutually agreed to time by the parties hereto." That apparently never occurred.

The Petersons executed a similar Bill of Sale by which they assigned their interest in Superior to Challenger, again effective as of January 1, 2003.[8] As with the Rolling Thunder transaction, the instrument was dated November 25, 2003 but actually signed and acknowledged by the Petersons on January 22, 2004 and counter-signed by K. Craig Davis, president of Challenger, on the same date. The stated consideration for this purchase was $401,014.00,

---

6. Dkt. 316, Appendix B. The transcript of Nancie's 2004 examination was also admitted without objection as an exhibit at the evidentiary hearing..

7. Exhibit D. The Petersons described this Bill of Sale as the means to bring Rolling Thunder back into Challenger for the purposes of sale to MTI/USA.

8. Exhibit E.

payable on the same or similar terms as the Rolling Thunder assignment.

Other than the Petersons' testimony that they had possession of the Bills of Sale for about a month before they signed them, there is no explanation for the lag between the actual date of the assignments (November 25, 2003) and the date of their execution (January 22, 2004). Nor was an explanation provided for the January 1, 2003 effective date of the assignments.

MTI/USA took over the operation of Rolling Thunder in December, 2003 even though the sale of Rolling Thunder to MTI/USA had not yet closed. Apparently, MTI never paid Challenger and, as might be expected, Challenger never paid the Petersons for the assignments of their interests in Rolling Thunder and Superior. In preparation for their depositions, Mike Walter prepared a timeline for the Petersons.[9] The timeline reveals that in December 2003, Challenger (referenced as "CIC" in the timeline) sold 100% of Rolling Thunder to MTI/USA.

After MTI/USA failed to make production payments to the various producers whose wells were connected to the pipeline, Challenger filed an action in Colorado state court against MTI/USA on March 30, 2004 to enforce the agreement between Challenger and MTI or to cancel it.[10] Attached to that Complaint as an exhibit is a "Bill of Sale and Assignment of Interest and Assumption of Obligations" between Challenger and MTI whereby Challenger assigned its 100% interest in Rolling Thunder to MTI for the sum of $7,000,000. This document is in the same format as the Bill of Sale documents between the Petersons and Challenger regarding Rolling Thunder and Superior.[11] The Court takes judicial notice of the pleading filed in the Colorado court.

On January 1, 2004 (before the Petersons executed their Bills of Sale on January 22), Mike Walter, as president of *Rolling Thunder*, executed a promissory note in favor of the Petersons for $728,686.50.[12] Nancie Peterson testified that this note was given because the Petersons realized that Challenger and/or MTI/USA were not "coming across" with the payment referenced in their Bills of Sale to Challenger, and the Petersons agreed to take this lesser amount as a "partial payment" for the Petersons' assignment of their interests in Rolling Thunder and Superior to Challenger. The Petersons also accepted this amount because the company was in trouble and they thought something was better than nothing. The Petersons and Rolling Thunder (by Mike Walter) signed this promissory note at Walter's home in Colorado on January 1, 2004.

Rolling Thunder also contemporaneously executed and delivered an unacknowledged "First Mortgage with Power of Sale" over Mike Walter's signature as President of Rolling Thunder on January 1, 2004.[13] Described as the collateral in this mortgage is Rolling Thunder's asset Rolling Sky—"all of the 50% ownership interest and operating rights in the Rolling Sky, LLC." The mortgage was not recorded until February 28, 2005 in Jefferson County, Colorado—nearly 14 months after it was signed and twenty days after the commencement of Rolling Thunder's bankruptcy case. Rolling Thunder established

9. Exhibit C.

10. Exhibit Q.

11. Like the Petersons' Bills of Sale to Challenger, the Challenger Bill of Sale to MTI was dated November 25, 2003 but actually executed and acknowledged on January 13, 2004.

It had an effective date of December 1, 2003 if MTI paid the $7,000,000 purchase price upon execution of the Bill of Sale.

12. Exhibit F.

13. Exhibit G.

Rolling Sky as an additional entity to hold a portion of the Kansas pipeline that it had acquired. The Articles of Organization for Rolling Sky, LLC were filed with the Colorado Secretary of State on January 9, 2004. Mike Walter was the manager of Rolling Sky. According to the Rolling Sky Operating Agreement, Rolling Thunder owned 50% of Rolling Sky.[14]

In July of 2004, the Colorado state court entered a default judgment against MTI in which it set aside *inter alia,* the conveyances of Rolling Thunder and Superior by Challenger to MTI/USA.[15] This Court takes judicial notice of the Colorado court's order for default judgment. Unfortunately, this relief came too late to save the operations of Challenger and its progeny, Rolling Thunder.

When MTI failed to make production payments to the producers, several of them "shut in" their operations—stopped producing gas for delivery on Rolling Thunder's pipeline because they were not being paid. This, in turn, diminished the value of the gas purchase contracts held by Thunderstruck and rendered Thunderstruck unable to pay its transportation fees to Rolling Thunder. Thunderstruck released its contract sellers to seek other shippers and, after losing that revenue stream, Thunderstruck filed a voluntary chapter 7 case in the District of Colorado on December 10, 2004.[16]

An involuntary petition against Rolling Thunder followed on February 7, 2005—3 weeks before the Rolling Thunder mortgage to the Petersons was recorded.

### The Committee's Objection and Petersons' Response

The Committee objects to the Petersons' claim asserting that their transaction with Rolling Thunder in fact arises out of the Petersons' investment in Rolling Thunder and not an indebtedness. The Committee also asserts that no legal consideration was exchanged for Rolling Thunder's note. To the extent that the Petersons' claim is allowed, the claim is likely unsecured, not least because the mortgage purporting to secure it was recorded after the petition date in this case.[17]

The Petersons assert that the note was in an amount equal to the book value of Rolling Thunder's one-half interest in Rolling Sky. They state that the note was intended to be a partial payment by Rolling Thunder of what Challenger owed them on account of their January 22, 2004 Bill of Sale and assignment of their interest in Rolling Thunder. The Petersons agree that, as a matter of form, the note should be from Challenger. They also concede that the only basis for a "debt" owing from Rolling Thunder would be their investment in Rolling Thunder. They accepted the note from Mike Walter who was a principal of both Challenger and Rolling Thunder and they strongly object to the Committee's characterization of the note as a "sham."

---

14. Exhibit H. The Operating Agreement designated Rolling Thunder as the operating member with authority to operate the companies [sic] assets. *See* Art. M.

15. Exhibit R. In addition to Rolling Thunder and Superior, Challenger had conveyed its interest in Thunderstruck to MTI. That Bill of Sale and Assignment was also set aside.

16. *In re Thunderstruck Production Group LLC,* Case No. 04–36829 (Bankr.D.Colo.).

17. The Trustee sought leave to sell the Rolling Sky assets in Sale No. 1 (*Dkt.41* ). The Petersons filed an objection to the sale, but when they failed to appear at the hearing on April 14, 2005, this Court overruled their objection for lack of prosecution. The Order approving the sale recites that the debtor's interest in Rolling Sky will be sold free and clear of liens (*Dkt.89* ).

### Analysis

■ A proof of claim is presumed valid unless and until the objecting party meets that presumption with competent evidence.[18] In that event, the burden of persuasion shifts to the claimant to prove the validity of his claim by a preponderance of the evidence.[19]

In this case, after reviewing the documents admitted into evidence, particularly the Rule 2004 examination testimony of David and Nancie Peterson, the Court concludes that the Committee has met the presumption of validity. Both of the Petersons testified that they received this note from Rolling Thunder when it was Challenger that owed them money for the unpaid assignment of their interest in Rolling Thunder.[20] Also of concern to the Court is the timing of the note given on January 1, 2004, *before* the Petersons ever executed the assignments to Challenger on January 22, 2004. Although the record is fairly clear that the intended sale of Challenger to MTI was already falling apart at January 1, neither Challenger nor Rolling Thunder owed the Petersons anything on January 1, when the note and mortgage were executed by Rolling Thunder. And, the entity covered by the mortgage, Rolling Sky, was not even established until January 9, 2004. All of this is more than sufficient to overcome the presumption of validity normally accorded to a proof of claim, shifting the burden of proof to the Petersons. While the Petersons proved they received the note and mortgage, substantial evidence supports the Committee's objection and defense of lack of consideration.

### Lack of Consideration

■ 11 U.S.C. § 502(b)(1) provides that if an objection to a claim is made, the Court shall allow the claim except to the extent that the claim is "unenforceable against the debtor and property of the debtor, under any . . . applicable law for a reason other than because such claim is contingent or unmatured." The promissory note from Rolling Thunder is subject to challenge as being without legal consideration because the Petersons did not lend any money to, and do not claim to be owed any money by Rolling Thunder. In addition, they claim to hold a mortgage, which on its face was recorded only after the case was filed, raising the likelihood that the lien could be avoided as an unauthorized post-petition transfer under § 549.

Before analyzing the Committee's defense of lack of consideration, the Court must first determine which state's substantive law of contracts applies. Neither the promissory note or the mortgage contains a contractual choice of law provision. The Committee does not address the applicable substantive law in its trial brief. Here, as a bankruptcy court hearing essentially a state law contract claim in which no significant federal policy is implicated, the Court will apply the choice of law rules of the forum state Kansas.[21]

---

18. Fed. R. Bankr.P. 3001(f); 11 U.S.C. § 502(a) and (b)(1). *See In re Broadband Wireless Intern. Corp.,* 295 B.R. 140, 144 (10th Cir. BAP 2003).

19. *In re Broadband Wireless Intern. Corp.* 295 B.R. at 145 (Once the objecting party has overcome the threshold prima facie effect of a properly filed proof of claim, the claimant or creditor has the ultimate burden of persuasion as to the validity and amount of the claim.); *In re Harrison,* 987 F.2d 677, 680 (10th Cir.1993).

20. Under the shifting burden of proof, it became incumbent upon the creditor (the Petersons) to present evidence to establish a debt owed by the debtor (Rolling Thunder) to them. *See In re Broadband Wireless Intern. Corp.,* 295 B.R. at 145.

21. *In re Payless Cashways,* 203 F.3d 1081 (8th Cir.2000) (Bankruptcy court applies the

 Kansas choice of law rules apply the rule of *lex loci contractus* for contract actions (*i.e.* the law of the state where the contract was made).[22] In this case, it is undisputed that the Petersons received the note and mortgage from Mike Walter, who signed them as president of Rolling Thunder, on or about January 1, 2004. The Petersons reside in Nebraska and Walter resides in Colorado. Rolling Thunder is a Kansas limited liability company and its gas gathering system is located in Kansas. The note and mortgage were executed by Walter in his Colorado home and given to his in-laws, the Petersons, in Colorado. Eventually, the Petersons recorded the mortgage in Colorado. Under these facts, the note and mortgage (*i.e.* the contracts) were made in Colorado. The Court therefore applies Colorado's substantive law of contracts to the Committee's contention that the note is unenforceable for lack of consideration.

 Under Colorado law, an agreement not supported by consideration is unenforceable.[23] A presumption arises from the existence of a signed written instrument that it is supported by adequate consideration, but the presumption is rebuttable.[24] When evidence is introduced tending to prove lack of consideration, the issue of valid consideration becomes a question of fact. Where the payee of a promissory note is unable to establish any exchange of money or anything else of value occurred upon the execution of a note, the note is not supported by consideration and is unenforceable.[25]

In *Grant v. Oten*, the plaintiff-payee commenced an action in 1979 to foreclose a deed of trust recorded against real property owned by the payor. The foreclosure arose from a new note and deed of trust payor executed in 1962 with respect to the property.[26] The court dismissed the plaintiff's complaint for lack of consideration, finding that the plaintiff-payee was unable to show that any exchange of money or value occurred when defendant-payor executed the 1962 note (increasing defendant's indebtedness) and deed of trust further encumbering her property.[27]

Here, the Petersons argue that while the note admittedly should have been executed and delivered by Challenger, they did business with Walter, their son in law,

choice-of-law rules of the state in which it sits); *In re Gaston & Snow*, 243 F.3d 599 (2nd Cir.2001) (Bankruptcy court hearing state law claims applies choice of law rules of forum state, not federal choice of law rules).

**22.** *See Heatron, Inc. v. Shackelford*, 898 F.Supp. 1491, 1499 (D.Kan.1995) (Contention that noncompete agreement lacked consideration would be governed by Kansas law where it was executed in Kansas); *The Bradbury Co., Inc. v. Teissier-duCros*, 387 F.Supp.2d 1167, 1171 (D.Kan.2005) (An agreement made in Kansas would be governed by Kansas substantive law of contracts.); *Novak v. Mutual of Omaha Ins. Co.*, 29 Kan.App.2d 526, 534, 28 P.3d 1033 (2001) (Kansas follows the Restatement (First) of Conflicts of Laws that the law of the place of contract formation governs construction of contract, not the place of performance.); *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 209–

10, 4 P.3d 1149 (2000) (A contract is made at the time when the last act necessary for its formation is done, and at the place where that final act is done.).

**23.** *City of Arvada v. Concrete Contractors, Inc.*, 628 P.2d 170 (Colo.App.1981).

**24.** *Grant v. Oten*, 626 P.2d 764 (Colo.App. 1981).

**25.** *Id.*

**26.** The previous note that defendant had assumed was paid off and the original deed of trust was released in 1964. *Id.* at 765.

**27.** *Id. See also, Weston v. Livezey*, 45 Colo. 142, 100 P. 404 (1909) (A promise without consideration to pay moneys for which the promisor is not liable is without effect.).

and the note was his effort to try to repay them some part of what they had not yet received from Challenger. What makes this argument fail is the temporal sequence of the "repayment" note being given even before the Petersons made their assignment and the fact the Rolling Thunder did not owe them anything. They loaned Rolling Thunder no money and did not consider any of their investment in Rolling Thunder to be a loan. The only reason they give for Rolling Thunder executing the note is their effort to "tie something down" as it appeared the MTI/USA transaction was unlikely to bear fruit. While these companies appear to have the common element of ownership by either Mike Walter or an entity owned or controlled by him, this Court cannot conclude that dealing with Rolling Thunder is the equivalent of dealing with Challenger. The Petersons have not asked this Court to pierce the corporate veil of Rolling Thunder and nothing the Petersons have adduced as evidence to date would support a conclusion that Challenger and Rolling Thunder are anything other than two separate legal entities.

The evidence adduced by the Committee here is that on January 1, 2004, Rolling Thunder owed the Petersons nothing. Indeed the purported basis for their claim, the breached sale and assignment to Challenger, did not arise until they executed it on January 22, 2004. Even then, their assignment was to Challenger, not Rolling Thunder. The Petersons themselves told the Court that the only basis for Rolling Thunder making this note was to pay part of Challenger's obligation to them.

Accordingly, there was simply no consideration for the note or the grant of the mortgage by Rolling Thunder to the Petersons.[28] The lack of consideration is a defense to the enforcement of the note and warrants disallowance of their claim under § 502(b)(1).

### Statutory Subordination

With the disallowance of the Petersons' claim, the Court need not reach the more difficult issue of whether their claim is subject to subordination under 11 U.S.C. § 510(b), but the Committee raised that issue and some comment is warranted. While the Petersons' claim clearly appears to be a consequence of their attempt to sell their interest in Rolling Thunder back to Challenger, it is not entirely clear that theirs is a claim for "damages arising from the purchase and sale of such a security" that would be subordinated under § 510(b).[29] The claim paid by the note was their claim against Challenger when it breached its contract to pay the Petersons for the assignment of their interests in Rolling Thunder and Superior. The promissory note purported to pay that claim in part and could be construed as a payment in connection with the sale of Rolling Thunder equity to Challenger, one of its affiliates. The Code accords these types of claims lesser priority because, as the Tenth Circuit has put it, "its [510(b)'s] language, its legislative history, and most important, its embodied legislative policy choices, reflect strong congressional disapproval of investor fraud claims in bankruptcy... Put simply, creditors stand ahead of the investors on the receiving

---

**28.** A similar conclusion would obtain if the Court were to apply the substantive law of Kansas. At Kansas law, for a contract to be enforceable, it must be supported by valuable consideration. KAN. STAT. ANN. § 16–107 (1995). This statute requires that all contracts "shall import a consideration." The Kansas Supreme Court has stated that "[this]

statute means if a contract is written the existence of consideration is presumed unless the lack of consideration is raised as an affirmative defense and is proved by substantial competent evidence." *State ex rel. Ludwick v. Bryant*, 237 Kan. 47, 50, 697 P.2d 858 (1985).

**29.** 11 U.S.C. § 510(b).

line." [30] Here, because there was *no* consideration for the promissory note given by Rolling Thunder, the claim must be disallowed in its entirety, rendering the subordination issue essentially moot.

The Committee's objection to claim no. 11 of the Petersons is SUSTAINED.

**30.** *In re Geneva Steel Co.,* 281 F.3d 1173, 1179 (10th Cir.2002), *citing In re Granite Partners,* *L.P.,* 208 B.R. 332, 344 (Bankr.S.D.N.Y.1997).